Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the putative Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARISSA PORCUNA and GENA ALEXANDER, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>XANDR, INC., a Delaware corporation,<br><br>*Defendant*. | Case No. 3:25-cv-07385-WHO<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR**<br><br>(1) **Intrusion Upon Seclusion;**<br>(2) **Invasion of Privacy;**<br>(3) **Violations of Cal. Penal Code § 631(a); and**<br>(4) **Violations of 18 U.S.C. § 2510, *et seq.***<br><br><br>**AND DEMAND FOR JURY TRIAL** |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Marissa Porcuna and Gena Alexander ("Plaintiffs") bring this First Amended Class Action Complaint and Demand for Jury Trial on behalf of themselves and all others similarly situated against Defendant Xandr, Inc. ("Xandr" or "Defendant"). Plaintiffs seek relief for Xandr's unlawful interception of consumers' electronic communications and its use of that intercepted data to build persistent, "cradle-to-grave" consumer profiles, and to disseminate their data to numerous third parties, including foreign adversaries, in violation of federal law and fundamental privacy rights. Plaintiffs allege the following based on personal knowledge as to themselves and on information and belief as to all other matters.

1

## NATURE OF THE ACTION

1.    This case challenges Xandr's operation of a hidden "commercial surveillance" system targeting U.S. consumers.[1] Xandr operates one of the largest advertising exchanges in the world. In doing so, it functions effectively as a data broker: aggregating information about individuals across thousands of unrelated websites, tracking them, building individual-level behavioral profiles about them, and monetizing those profiles by transmitting the data to third parties for advertising, analytics, and related commercial purposes.

2.    Plaintiffs and Class Members never signed up for Xandr's services. They did not create Xandr accounts. They did not intend to communicate with Xandr. Most people have never even heard of Xandr. Yet Xandr intentionally acquires and exploits information about unsuspecting consumers through undisclosed tracking and identity-matching code embedded in websites and mobile applications.

3.    Xandr's commercial surveillance operates through a system called real-time bidding—an automated auction process in which advertisers compete in milliseconds to display ads to specific users.[2] These auctions take place surreptitiously in the background each time a webpage loads.

4.    It works like this: Xandr intercepts detailed user data and merges it with existing behavioral profiles linked to persistent identifiers that Xandr has assigned to each consumer. These persistent identifiers are designed to recognize the same individual across time, devices, and contexts, making such users identifiable, trackable, and targetable.

5.    Each behavioral profile is built around these persistent identifiers. Using these identifiers, Xandr aggregates information about a consumer's behavior—such as the webpages they visit—into a single, unified profile. Xandr then enriches that identifier-linked profile with its own

---

[1] The Federal Trade Commission defines "commercial surveillance" as the business of collecting, analyzing, and profiting from information about people. *Commercial Surveillance and Data Security Rulemaking*, Fed. Trade Comm'n (Aug. 11, 2022), https://www.ftc.gov/legal-library/browse/federal-register-notices/commercial-surveillance-data-security-rulemaking.

[2] *Bidder – Auction overview*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/the-big-picture.

2

first-party data, including data acquired through Microsoft's ecosystem of products and services, and further supplements it with information obtained from third-party data brokers and identity vendors.

6.      Highly detailed inferences are made about consumers based on their behavior—such as their health conditions, financial status, occupation, location, and sexual preferences. Through the ongoing collection, retention, and enrichment of user data, and these inferred attributes, Xandr constructs comprehensive "cradle-to-grave" consumer profiles that track users' behaviors, interests, and inferred traits across large swaths of their digital lives.

7.      Xandr and its partners often describe these profiles as "pseudonymous." That description is a fiction because the profiles are anchored to persistent identifiers. Those identifiers function as unique personal markers—comparable in practice to account or Social Security numbers—persistently connecting individuals to their online activity across time, services, and contexts.

8.      The harm does not stop at building profiles. Xandr's real-time bidding system is designed to broadcast what is known as "bidstream data"—which includes the persistent identifiers tied to individual users, the specific webpages they have viewed/are viewing, device and browser information, and sensitive behavioral inferences derived from their profiles—to third parties participating in an advertising auction.

9.      The recipients of this bidstream data are not limited to a single company, nor are they confined to entities located in the United States. The recipients include a wide range of third parties participating in the advertising auctions, including companies that operate as data brokers or otherwise collect and monetize user data. These third parties may also share or resell the data, creating a cascading series of privacy violations.

10.      Xandr's misconduct constitutes a profound invasion of privacy. Consumers reasonably expect that their private online activity—especially visits to websites concerning health, disability, addiction, or other sensitive matters—will not be systematically intercepted, aggregated,

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

shared, and converted into enduring behavioral profiles for commercial exploitation by a company they did not know existed and with whom they have no relationship.

11.    It also poses a serious national security risk. By transmitting sensitive data to third parties, including foreign-owned entities that have been deemed adversaries of the United States, Xandr exposes detailed information about Americans' health concerns, vulnerabilities, and personal circumstances to misuse, repurposing, or exploitation like blackmail. Once broadcast through real-time bidding, this information cannot be meaningfully recalled or secured.

12.    As detailed herein, Plaintiffs bring claims on behalf of two overlapping classes. First, Plaintiffs allege that on certain websites that deploy Xandr's tracking and identity-synchronization code, Xandr transmits users' data to Temu, a Chinese e-commerce platform, in violation of federal restrictions on the transfer of Americans' bulk sensitive personal data to entities associated with foreign adversaries. Those users comprise the nationwide BSD Class.

13.    Second, Plaintiffs allege that Xandr operates a pervasive system that generates and disseminates consumer profiles for commercial gain; California residents subjected to that profiling comprise the California Class.

14.    Although the classes overlap, they are not coextensive, as the BSD Class is defined by unlawful transfers to Temu, while the California Class is defined by privacy-violating profiling practices under California law.

15.    Plaintiffs seek statutory damages, as well as equitable relief, including an injunction prohibiting Xandr from continuing to intercept user communications and from aggregating or transmitting sensitive user data to third parties in violation of federal law and fundamental privacy rights.

## **PARTIES**

16.    Plaintiff Marissa Porcuna is a natural person and citizen of the State of California. She resides in Bay Point, which is located within the Northern District of California.

4

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

17.     Plaintiff Gena Alexander is a natural person and citizen of the State of California. She resides in Palm Desert, California.

18.     Defendant Xandr, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 1 Microsoft Way, Redmond, Washington 98052.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action: (1) pursuant to 28 U.S.C. § 1331 because cases under the ECPA, 18 U.S.C. § 2510, *et seq*., raise a federal question and (2) pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) there are more than 100 Class Members, (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iv) none of the exceptions under that subsection apply to this action.

20.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

Venue is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff Porcuna resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

## DIVISIONAL ASSIGNMENT

21.     Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco Division is proper because a substantial part of the events giving rise to Plaintiff Porcuna's claims occurred in Contra Costa County, and Plaintiff Porcuna resides in Contra Costa County.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-07385-WHO

1

## COMMON FACTUAL ALLEGATIONS

2

**I.    Xandr's Scale and Reach in the Online Advertising Ecosystem.**

3

4        22.    Xandr operates one of the largest and most technologically sophisticated surveillance

5    and targeting systems in the global digital advertising industry. Formerly known as AppNexus,

6    Xandr was previously owned by AT&T and was acquired by Microsoft Corporation in 2022. Xandr

7    now operates as a wholly owned Microsoft subsidiary. Through this acquisition, Microsoft

8    integrated Xandr into its broader advertising, data, and cloud infrastructure, dramatically expanding

9    Xandr's scale, reach, and access to capital.[3]

10        23.    Xandr occupies a central and unavoidable position in the modern online advertising

11    ecosystem. Programmatic advertising[4]—sold through automated real-time bidding ("RTB")

12    auctions—accounts for the vast majority of digital advertising in the United States, with industry

13    estimates indicating that nearly 90% of digital ads are delivered through this model.[5] Xandr is a

14    major participant in this ecosystem, operating at multiple levels of the advertising stack, i.e., the

15    layers of technology involved in delivering digital ads from advertiser to end users.

16        24.    Xandr's promotional materials confirm the extraordinary scale and granularity of the

17    data used by Xandr and Microsoft's advertising systems. As illustrated in Figure 1 below, Xandr's

18    "audience intelligence uses billions of data points," combining signals including users' searches,

19    web activity, browser behavior, and profile data to "identify consumer intent" and deliver targeted

20    ads in real time. Its systems process "20 billion daily cross-screen data signals refreshed every

21

22    _____

[3] Mikhail Parakhin, *Microsoft to acquire Xandr to accelerate delivery of digital advertising and retail media solutions*, Microsoft Advertising Blog (Dec. 21, 2021),
23    https://about.ads.microsoft.com/en/blog/post/december-2021/microsoft-to-acquire-xandr-to-accelerate-its-digital-advertising-and-retail-media-solutions.

24    [4] Programmatic advertising is the automated buying and selling of digital advertising space using software systems and real-time auctions, in which ads are selected and delivered to users based on
25    data about the user, the content being viewed, and advertiser bidding criteria, typically within milliseconds of a webpage or app loading.

26    [5] Bill Nash, *Programmatic Advertising Statistics 2025: 91+ Stats & Insights,* Marketing LTB Blog
27    (Nov. 10, 2025), https://marketingltb.com/blog/statistics/programmatic-advertising-statistics/.

6

28

second," leveraging first-party data across a "massive" connected ecosystem to build detailed

audience profiles and predict individual users' interests and intent.[6]



**Figure 1.** Promotional materials describing Xandr's audience intelligence and data scale.

25.    Xandr's tracking and auction infrastructure is embedded across tens of thousands of

high-traffic websites and mobile applications through both direct and indirect integrations. Xandr

integrates directly with publishers—such as website operators and mobile application developers

that make advertising space available for sale—and also receives advertising traffic through

intermediary companies that route advertising auctions through Xandr's platform. Thus, Xandr

positions itself to receive user-linked data even when Xandr does not directly collect the data from

the website itself.

26.    Xandr also actively solicits and enables third-party data providers to upload

consumer "segment" data into its platform.[7] Xandr then incorporates this third-party information

into its systems to classify users into increasingly granular categories for advertising and targeting

---

[6]*Microsoft Audience Network – Publisher Growth with Xandr One-Sheet*, Microsoft Advertising's Global Channel Partner of the Year award for 2025, Diginius, (Oct. 2022), https://diginius.com/wp-content/uploads/2022/10/Microsoft-Audience-Network-Publisher-Growth-with-Xandr-one-sheet-EN1.pdf.
[7] In this context, a "segment" refers to a defined group of users categorized based on shared attributes or inferred characteristics—such as demographic traits, interests, behaviors, or other profile data—used by advertising platforms to target ads to users who meet specified criteria.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

purposes, a process Xandr promotes to its partners as enabling "sophisticated user targeting" and "increased return on investment."[8]

27.    Taken together, these practices cause consumers to encounter Xandr's tracking and data-collection mechanisms repeatedly during their web browsing, regardless of whether they have ever heard of Xandr or intentionally interacted with the company. Xandr's reach is inescapable: consumers cannot meaningfully avoid exposure to Xandr's systems simply by choosing different websites or applications.

**A.    Xandr's Multi-Role Position in the Online Advertising Ecosystem Enables It to Collect, Enrich, and Distribute User Data.**

28.    Xandr operates simultaneously on both sides of the programmatic advertising market. On the "buy side," it provides tools and infrastructure that allow advertisers and demand-side platforms—companies that act on behalf of advertisers to evaluate users and automatically submit bids for advertising opportunities across the web—to participate in real-time advertising auctions.[9] On the "sell side," it integrates directly with publishers by providing software and code that publishers embed into their websites and applications to monetize advertising space.[10]

29.    Bridging these two sides, Xandr also operates as an advertising exchange and marketplace. In this role, Xandr functions as the central intermediary that receives open spots on websites and mobile applications where advertisements can be displayed, assembles and enriches

---

[8] *Digital Platform API – Batch Segment Service best practices*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/digital-platform-api/batch-segment-service-best-practices.
[9] *Buy-side overview*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/digital-platform-api/02---buy-side-overview.
[10] *Sell-side overview*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/digital-platform-api/03---sell-side-overview.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

data about the user viewing the page, distributes that data to potential advertisers, collects bids in real time, and determines which advertisement is ultimately shown to the user.[11]

30.      In simpler terms, Xandr operates a data brokerage market in which access to users—and to detailed consumer profiles—is continuously auctioned to the highest bidder. The market is triggered each time a user loads a webpage or opens an application that displays programmatic advertising.[12]

31.      As detailed below, Xandr's advertising exchange and profiling operations rely on a coordinated set of technologies that enable the large-scale collection and monetization of user data.

**B.      Xandr Intercepts Website Communications, Diverts the Data to Its Own Servers, and Syncs User Identifiers with Third Parties to Enrich and Monetize Consumer Profiles.**

32.      To power its advertising platform, Xandr provides publishers with invisible tracking and auction technologies that are embedded directly into publishers' websites and mobile applications.

33.      These technologies execute automatically within users' browsers and devices when a page loads, allowing Xandr to intercept, duplicate, and redirect data generated during users' electronic communications with websites.

34.      Xandr's interception technologies include, among others:

---

[11]*Data enrichment (preview) overview,* Microsoft Learn (Feb. 1, 2024), https://learn.microsoft.com/en-us/dynamics365/customer-insights/data/enrichment-hub. *See also Bidder - Auction overview,* Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/the-big-picture. *See also Let Microsoft Advertising manage your bids with bid strategies*, Microsoft Advertising, https://help.ads.microsoft.com/#apex/ads/en/56786/1 (last visited Feb. 5, 2026).
[12]*Integrate a bidder,* Microsoft Learn (October 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/integrate-a-bidder.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

a.      JavaScript tracking scripts, which are embedded in webpages and execute automatically when a page loads, causing the user's browser to transmit information about the user's session, device, and page activity to Xandr-controlled servers; [13]

b.      Prebid.js adapters and header bidding components, which integrate Xandr into the website's advertising auction process and allow Xandr to receive user-linked bid requests at the earliest stage of the page-rendering sequence, before the page finishes loading; [14] and

c.      Identity-syncing endpoints, which instruct the user's browser—typically through HTTP redirects and cookie-based requests—to contact Xandr and third-party tracking domains to exchange identifiers so that multiple adtech entities can recognize and track the same user across websites, sessions, and devices. [15]

35.     When a user visits a website incorporating Xandr's tracking infrastructure, Xandr's code executes contemporaneously with the user's communication with the website. Information intended for the first-party website—such as requests for page content—is duplicated and redirected to Xandr's servers as part of the advertising and auction process, without the user's knowledge or consent.

36.     For example, when a user visits a website that incorporates Xandr's tracking infrastructure, Xandr's embedded code runs automatically as the page loads. While the user is in the process of viewing the page, that code causes the user's browser to collect and transmit information about the user and the page being accessed—including persistent identifiers associated with the

---

[13] *Working with Microsoft Advertising's seller tag (AST)*, Microsoft Learn, (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/working-with-seller-tag.
[14] *AppNexus Bidder Integration*, Prebid (Prebid Developer Documentation), https://docs.prebid.org/dev-docs/bidders/appnexus.html (last visited Feb. 5, 2026).
[15] *Synchronize Your User IDs*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/synchronize-your-user-ids.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

user, technical details about the user's device and browser, and the full URL of the webpage—to Xandr.[16]

37.     This information is transmitted to Xandr as part of an automated advertising request, known as a "bid request," which Xandr then controls and distributes to advertisers and other participants in the advertising auction so they can decide whether and how to target the user.

38.     The bid request includes information describing the substance of the user's communication with the website, including the full URL of the page being viewed and the referring source.[17] This data reveals the specific content the user is accessing—such as articles, forum posts, or other sensitive material—at the precise moment the data is intercepted and transmitted.

39.     In addition to duplicating and diverting website communications to its own servers, Xandr synchronizes user identifiers with third parties through a process commonly known as "identity syncing," or "user syncing." This process instructs the user's browser to contact Xandr-controlled and third-party servers to exchange unique identifiers, which are then stored and correlated on Xandr's servers.

40.     Through this process, Xandr maps browser-based identifiers to server-side identity records, allowing Xandr and its partners to recognize and track the same individual across different websites, sessions, devices, and contexts. This linkage enables long-term tracking and aggregation of users' browsing behavior even where a user has never directly interacted with Xandr or its downstream partners.

41.     As Xandr's own documentation explains, Xandr assigns and maintains user identifiers both in browser-accessible storage and on Xandr-controlled servers, enabling Xandr to

---

[16] *Xandr's Bidders*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/data-providers/xandr-s-bidders.
[17] *Supply Partners - Bid request*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/supply-partners/bid-request.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

recognize returning users even where client-side identifiers are cleared, deleted, or changed.[18] Accordingly, consumers cannot meaningfully avoid or escape Xandr's tracking.

42.    Xandr has publicly represented that it maintains billions of identifiers that allow it to recognize and link devices used by the same consumer across different websites, applications, and platforms.[19] The next section describes the mechanisms through which Xandr builds and maintains these long-term consumer profiles.

## II.    Xandr's Construction of Cradle-to-Grave Consumer Profiles.

### A.    Xandr's Persistent Identifier System Enables Long-Term Individual Tracking Despite Claims of Pseudonymity.

43.    Central to Xandr's tracking and profiling operation is its use of persistent identifiers—unique technical markers that function like account numbers, or Social Security numbers, enabling Xandr to recognize the same consumer across time, devices, and web domains.

44.    Xandr observes users through a variety of identifying signals, including mobile advertising IDs, device fingerprints, hashed email addresses, IP address–based signals, and identifiers stored in browser cookies.

45.    Xandr uses these different identifiers to determine when multiple interactions, devices, or sessions belong to the same person and then links those activities to a single, primary persistent identifier: the UUID, a numeric identifier that appears as a string of numbers, such as '7738918429796999062.'

---

[18] *Synchronize your user IDs*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/synchronize-your-user-ids; *Microsoft Monetize – Server side cookie store*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/server-side-cookie-store.

[19] *Xandr Builds an Identity Graph for Millions of Customers for Entity Resolution using TigerGraph*, TigerGraph (2020), https://info.tigergraph.com/hubfs/Collateral/TigerGraph-Xandr-Success-Story.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

46.    As explained above, this identifier is stored both in browser-accessible cookies and on Xandr-controlled servers.[20] This enables Xandr to re-identify a user using server-side syncing even if the user deletes cookies or switches devices.[21]

47.    The aggregated consumer profiles Xandr maintains are tied to its UUID identifier. Because the UUID itself does not contain a person's name—again, it is a numeric string like '7738918429796999062,' Xandr characterizes the associated profiles as "pseudonymous." But this characterization is a fiction designed to obscure the reality of Xandr's surveillance practices.

48.    Indeed, regulatory authorities have made clear that identifiers like UUID are not meaningfully anonymous or pseudonymous merely because they lack obvious personal labels. The Federal Trade Commission ("FTC") has explained that, "[r]egardless of what they look like, all user identifiers have the powerful capability to identify and track people over time, therefore **the opacity of an identifier cannot be an excuse for improper use or disclosure**." (emphasis in original).[22]

49.    The FTC has further stated that "[c]ompanies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm."[23]

50.    Xandr's own profiling practices confirm that UUID-linked profiles are readily attributable to real individuals. As described further below, Xandr assigns users to highly specific behavioral and demographic segments that reflect sensitive characteristics, including health

---

[20] *Synchronize your user IDs*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/synchronize-your-user-ids.

[21] *Microsoft Monetize – Server side cookie store*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/server-side-cookie-store. *See also Synchronize your user IDs*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/synchronize-your-user-ids.

[22] *No, hashing still doesn't make your data anonymous*, Fed. Trade Comm'n (July 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

[23] *No, hashing still doesn't make your data anonymous*, Fed. Trade Comm'n (July 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

conditions, employment statuses, roles, and responsibilities, political affiliations, household composition, and physical locations.

51.    These segment assignments, combined with page-level browsing data and cross-device linkage, reveal patterns of behavior that can readily single out a particular person, household, or workplace and enable persistent tracking of that individual over time.

52.    Xandr's own technical specifications further undermine its "pseudonymous" characterization. Xandr admits that its systems identify users at the household level using shared identifiers such as IP addresses and cross-device identity graphs, and can link multiple devices and individuals within the same home.[24] Xandr cannot credibly claim that its consumer profiles are pseudonymous while simultaneously advertising the ability to identify a specific household and differentiate among its occupants.

53.    In addition, Xandr enriches consumer profiles using data derived from account-based sources that are tied to real-world identities. As described below, Xandr incorporates first-party data from Microsoft's ecosystem of products and services and third-party identity and data providers that rely on logged-in accounts, hashed email addresses, and other deterministic identifiers. This account-linked data is used to resolve identities across devices and contexts and is associated with UUID-linked profiles, making it easy to reconnect those profiles to real individuals through routine data linkage and enrichment processes.

54.    At bottom, Xandr's business model depends on making these consumer profiles increasingly identifiable and valuable. The longer a person is tracked, the more detail can be added to their individual profile, enhancing its value to potential advertisers. The longer any persistent identifier is used, the richer and more unique the behavior profile attached to it becomes, making it increasingly straightforward to infer or reattach real-world identity.

---

[24] *Microsoft Invest - Household Attribution*, Microsoft Learn (Oct. 19, 2024). https://learn.microsoft.com/en-us/xandr/invest/household-attribution.
*See also Microsoft Invest - Cross-device targeting and measurement*, Microsoft Learn (Jan. 15, 2025), https://learn.microsoft.com/en-us/xandr/invest/cross-device-targeting-and-measurement.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

**B.      Xandr Builds Consumer Profiles Through Direct Data Collection, First-Party Microsoft Data, and Third-Party Data Provider Partnerships.**

**(i)   Xandr Collects Browsing Activity and Generates Behavioral Inferences to Populate Individual Consumer Profiles.**

55.      Once Xandr assigns a consumer a persistent identifier, it begins constructing a detailed behavioral profile associated with that individual. These profiles are populated through observations of the person's digital activity—such as websites and apps visited, content engaged with, and interaction frequency.[25]

56.      Xandr does not just record raw consumer activity. It analyzes this behavioral data to generate inferences about the consumer, including likely interests, health-related concerns, financial status, and other personal characteristics. These inferred attributes are retained and continuously updated, allowing Xandr to maintain an evolving, long-term record of an individual's digital behavior over time.

**(ii) Xandr Uses Microsoft and "Tapad" Identity Graphs to Tie Multiple Devices and Activities to a Single Individual.**

57.      Xandr further enriches consumer profiles through identity resolution, which relies on "identity graphs"—databases designed to link multiple devices, accounts, and data sources to a single individual. Through these identity graphs, Xandr can recognize when separate browsing sessions, devices, or services are being used by the same person, allowing advertisers to link and act on behavior across contexts—for example, using viewing activity on a connected television to influence the ads shown to that same individual while browsing the internet on a mobile phone.

58.      Xandr integrates identity graphs from first-party sources controlled by Microsoft and Microsoft partners, as well as from third-party data providers.[26]

---

[25] *Microsoft Invest - In-Market audiences*, Microsoft Learn (Apr. 7, 2025), https://learn.microsoft.com/en-us/xandr/invest/microsoft-in-market-audiences.

[26] *Microsoft Invest – Cross-Device Targeting and Measurement*, Microsoft Learn (Jan. 15, 2025) https://learn.microsoft.com/en-us/xandr/invest/cross-device-targeting-and-measurement. *See also Xandr Builds an Identity Graph for Millions of Customers for Entity Resolution using TigerGraph*, TigerGraph, https://www.tigergraph.com/xandr/ (last visited Feb. 5, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

59.     The first-party identity graphs Xandr uses from Microsoft are particularly powerful because they tie together information about users based on their use of Microsoft services including Bing, Windows, Microsoft 365, and Edge.[27] The primary tool is the Microsoft Advertising Identity Graph, which Microsoft describes as enabling it to "tie[] together events or actions for a unique individual that occur on different devices."[28] This functionality allows Xandr to associate activity from a user's smartphone, laptop, tablet, and other devices with a single consumer profile.

60.     Xandr also supplements its identity resolution capabilities by integrating data from Tapad, a cross-device identity company owned by data broker Experian.[29] Tapad maintains over 4.2 billion digital identifiers covering approximately 250 million U.S. individuals.

61.     Tapad's identity graph uses both probabilistic techniques—such as statistical inferences based on shared IP addresses, device characteristics, and browsing patterns—and deterministic techniques, including matches based on login credentials or hashed email addresses, to determine when multiple devices or sessions belong to the same individual.

62.     Xandr represents that Tapad enables it to "target and attribute across multiple devices," meaning that activity observed on one device can be attributed to the same individual using another device.[30] Xandr further recognizes that Tapad "combines curated data with machine

---

[27] *Maximize Q4 Holiday Sales with Microsoft's Expert Tips*, Optmyzr (Oct. 29, 2024), https://www.optmyzr.com/ppc-town-hall/maximize-q4-holiday-sales-with-microsoft-s-expert-tips/. *See also* James Hercher, *Microsoft Is Deprioritizing Third-Party Ad Tech Amid Reorgs And Layoffs*, AdExchanger (June 6, 2023), https://www.adexchanger.com/platforms/microsoft-is-deprioritizing-third-party-ad-tech-amid-reorgs-and-layoffs/.
[28] *Cross-Device Targeting and Measurement*, Microsoft Learn (Jan. 15, 2025), https://learn.microsoft.com/en-us/xandr/invest/cross-device-targeting-and-measurement.
[29] *Microsoft Invest - Enable cross-device targeting and measurement for a line item*, Microsoft Learn (July 14, 2025), https://learn.microsoft.com/en-us/xandr/invest/enable-cross-device-targeting-and-measurement-for-a-line-item.
[30] *Enable Cross-Device Targeting and Measurement for a Line Item*, Microsoft Learn (July 14, 2025), https://learn.microsoft.com/en-us/xandr/invest/enable-cross-device-targeting-and-measurement-for-a-line-item.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

learning," allowing Xandr to algorithmically infer cross-device relationships and incorporate those linkages into unified consumer profiles.[31]

63.    These identity graphs lay the groundwork for Xandr's profiling system, which Xandr then amplifies through its own extensive third-party data enrichment and sharing practices described below.

### (iii) Xandr Enriches Profiles by Exchanging Persistent Identifiers with Third-Party Data Brokers.

64.    In addition to Microsoft's identity graphs and Tapad, Xandr maintains documented partnerships with approximately 190 data providers and user-sync partners, including LiveRamp, Oracle Data Cloud, Eyeota, and Epsilon. These entities operate as data brokers or data aggregators that maintain their own consumer identifiers and associated datasets.

65.    As introduced above, Xandr enriches its profiles through a process called "identity syncing" or "user syncing" with many of these third-party providers. Each of these companies maintains its own persistent identifiers and associated consumer profiles. Xandr initiates synchronization sessions where it effectively queries these partners: "I have a consumer profile tied to my persistent identifier for this person—do you have a matching profile for the same individual? If so, what persistent identifier have you assigned to that user?" The partner's data is then transmitted to Xandr and incorporated into Xandr's existing profile.

66.    This allows Xandr and the partner to then exchange data about the user (either in one-time exchanges, or during real-time bidding) and be confident that they are assigning that data to the correct individual, continuously expanding the dossier associated with that consumer. This is how behavior outside Xandr's direct data collection (including offline contexts such as in-person credit and debit card transactions) make their way into user segments used by Xandr for targeting and tracking individuals.

---

[31] *Microsoft Monetize – Targeting and Measurement (Cross-Device)*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/cross-device-targeting-and-measurement.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

67.    Many of Xandr's third-party data partners have been the subject of significant regulatory scrutiny, criminal enforcement actions, and public reporting for misconduct involving the misuse and sale of sensitive consumer data.

68.    For example, Epsilon—a third-party data provider partner that supplies audience data and consumer attributes for use within Xandr's platform—was the subject of criminal enforcement in September 2024, when a senior executive and a sales manager were sentenced to prison for selling targeted consumer lists used in mass-mailing fraud schemes that defrauded hundreds of thousands of Americans out of tens of millions of dollars.[32]

69.    In addition, OpenX Technologies, Inc.—a company that Xandr identifies as a user-sync provider—was the subject of a federal enforcement action brought by the FTC and the DOJ. In December 2021, OpenX agreed to injunctive relief and a $2 million civil penalty to resolve allegations that it unlawfully collected and disclosed personal information from children under the age of 13 without parental consent.[33]

70.    Public reporting has illustrated the scale and sensitivity of the data flowing through Xandr's system. Journalists reported that Xandr makes use of extensive audience segmentation, under which consumers are grouped into thousands of predefined categories derived from third-party data and modeled behavioral inferences. [34] These segments include classifications associated with sensitive attributes, such as religion, sexual orientation, political views, health conditions, and

---

[32] *Epsilon Senior Executive and Sales Manager Both Sentenced for Selling Data on Millions of U.S. Consumers to Fraudsters*, U.S. Department of Justice (Sept. 30, 2024), https://www.justice.gov/archives/opa/pr/epsilon-senior-executive-and-sales-manager-both-sentenced-selling-data-millions-us-consumers.

[33] *Advertising Platform OpenX Agrees to Injunctive Relief and $2 Million Payment in Case Alleging Violations of Children's Privacy Law*, U.S. Department of Justice (Dec. 28, 2021), https://www.justice.gov/archives/opa/pr/advertising-platform-openx-agrees-injunctive-relief-and-2-million-payment-case-alleging.

[34] Jon Keegan & Joel Eastwood, *From "Heavy Purchasers" of Pregnancy Tests to the Depression-Prone: We Found 650,000 Ways Advertisers Label You*, The Markup (June 8, 2023), https://themarkup.org/privacy/2023/06/08/from-heavy-purchasers-of-pregnancy-tests-to-the-depression-prone-we-found-650000-ways-advertisers-label-you.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

indicators of economic status or vulnerability. Xandr stores these audience segments and facilitates their use in real-time advertising auctions.

71.     The resulting scope of consumer profiling is staggering. In 2023, a database publicly hosted on Xandr's website revealed more than 650,000 distinct audience segments available for targeting.[35] These segments were created using behavioral inferences drawn from Xandr's data collection and enriched by third-party sources. The database included labels such as:

> "Job Role > Legal - Judge"
>
> "Incest/Abuse Support"
>
> "Her2 Positive – Breast Cancer"
>
> "Made a Charitable Donation - Conservative Politics"
>
> "Gambling Addiction"
>
> "Liberal Views on LGBTQ Rights and Pro-Choice"
>
> "Occupation > Disabled".

72.     These segments highlight not only the granularity, but the sensitivity of the inferences made as well. They reflect a system designed to extract and monetize deeply personal information without user awareness or consent. The presence of categories tied to specific health conditions, political affiliations, and life struggles demonstrates that Xandr's profiling infrastructure exposes intimate details of individuals' lives.

### (iv) Xandr Assigns Behavioral Segments Based on Individuals' Physical Locations and Movements.

73.     Xandr's profiling system also enables precise location-based targeting that amplifies privacy risks. Xandr's own documentation describes a "Geo Polygon Segment Service" that allows

---

[35]Xandr, *Data Marketplace Public Segments Pricing* (Excel spreadsheet), https://web.archive.org/web/20230525225541mp_/https:/xandr-be-prod.zoominsoftware.io/bundle/monetize_monetize-standard/page/attachments/data-marketplace-buyer-overview/data_marketplace_public_segments_pricing_05212021.xlsx (last visited Feb. 5, 2026).

advertisers to create geofenced segments based on custom polygons around real-world locations—including government buildings, hospitals, and schools.[36]

74.     This means that Xandr adds individuals to behavioral segments based on the buildings they enter or frequent. For example, Xandr's segment list included a category for people observed at the "Cannon House Office Building"—the congressional office building in Washington, D.C.[37] In practice, this means a person's physical movements through the world can be monitored, categorized, and monetized without their knowledge or consent, exposing political staffers, patients, students, or protestors to detailed commercial profiling simply for being present in a particular place.

75.     Location-based behavioral segmentation poses particularly acute risks for immigrants and other vulnerable populations. Location data tied to visits to immigration courts, government offices, shelters, medical facilities, or workplaces can be used to infer immigration status, legal vulnerability, or enforcement risk.

76.     Public reporting has documented that commercially obtained location and ad-tech data is already being used to track and target immigrant communities in the United States.[38] Investigative journalism has shown that federal immigration authorities have purchased tools that rely on location and device data harvested from the digital advertising ecosystem to identify people present at specific locations—such as immigration courts, workplaces, or protest sites—and to follow their movements over time, often without warrants.[39]

---

[36] *Geo Polygon Segment service*, Microsoft Learn (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/digital-platform-api/geo-polygon-segment-service.

[37] *See* Xandr, *Data Marketplace Public Segments Pricing* (Excel spreadsheet), https://web.archive.org/web/20230525225541mp_/https://xandr-be-prod.zoominsoftware.io/bundle/monetize_monetize-standard/page/attachments/data-marketplace-buyer-overview/data_marketplace_public_segments_pricing_05212021.xlsx (last visited Feb. 5, 2026).

[38] *Here's the Tech Powering ICE's Deportation Crackdown*, TechCrunch (Jan. 26, 2026) https://techcrunch.com/2026/01/26/heres-the-tech-powering-ices-deportation-crackdown/.

[39] Joseph Cox, *ICE to Buy Tool that Tracks Locations of Hundreds of Millions of Phones Every Day*, 404 Media (Sept. 30, 2025), https://www.404media.co/ice-to-buy-tool-that-tracks-locations-of-hundreds-of-millions-of-phones-every-day/.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

77.     More recently, in January 2026, U.S. Immigration and Customs Enforcement issued a public request for information seeking commercial ad-tech and location-data services to support investigative operations.[40]

78.     When location-based advertising data is aggregated, sold, or shared through Xandr's systems, it creates a pipeline through which individuals' physical movements can be repurposed for surveillance, enforcement, or coercion far beyond advertising and without meaningful safeguards.

### (v) Xandr Uses Real-Time Bidding to Continuously Expand and Redistribute Consumer Profiles.

79.     Another particularly concerning dynamic is Xandr's role in continuously enriching and redistributing this information through its RTB system.[41] With each ad auction, new behavioral signals are attached to existing profiles—not just by Xandr, but also by the numerous third parties who receive these bid requests. This creates a cascading cycle of redisclosure, wherein increasingly comprehensive identity dossiers are built and shared over time.

80.     Although only a single advertiser wins any given auction, dozens or even hundreds of participating companies receive bidstream data associated with the user. This data commonly includes persistent identifiers, IP addresses, device and browser information, the specific webpage or application being accessed, and inferred demographic or behavioral attributes. There are no technical limitations in the RTB process that prevents recipients from retaining, aggregating, or repurposing this data beyond the immediate auction, and many do so.

81.     As a result, third parties can siphon off Xandr's bidstream data at massive scale and use it to build their own independent dossiers about individuals—often without any direct relationship to the user and without meaningful oversight. These dossiers can be enriched over time by correlating bidstream data received from multiple ad exchanges and publishers, allowing

---

[40] Caroline Haskins, *ICE Asks Companies About 'Ad Tech and Big Data' Tools It Could Use in Investigations*, Wired (Jan. 24, 2026), https://www.wired.com/story/ice-asks-companies-about-ad-tech-and-big-data-tools/.

[41] *Bidder - Auction overview*, Microsoft Learn (Oct, 21, 2025), https://learn.microsoft.com/en-us/xandr/bidders/the-big-picture.

21

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

recipients to reconstruct detailed histories of individuals' online behavior, interests, locations, and vulnerabilities.

82.    These risks have been expressly identified by Congress. In April 2021, a bipartisan group of United States Senators—including Senators Bill Cassidy, Ron Wyden, Kirsten Gillibrand, Mark Warner, Sherrod Brown, and Elizabeth Warren—sent a formal letter to AT&T Inc. seeking information about its sharing of Americans' personal data through real-time bidding.[42]

83.    At the time the letter was sent, AT&T owned and operated Xandr as a wholly owned subsidiary responsible for running AT&T's digital advertising exchange.

84.    In that letter, the Senators warned that "[f]ew Americans realize that some auction participants are siphoning off and storing 'bidstream' data to compile exhaustive dossiers about them," and that these dossiers were "being openly sold to anyone with a credit card, including to hedge funds, political campaigns, and even to governments." The Senators emphasized that RTB systems routinely distribute sensitive information—including device identifiers, cookies, browsing and location data, IP addresses, and demographic attributes—to large numbers of auction participants.

85.    The Senators further warned that this data would be "a goldmine for foreign intelligence services," capable of being exploited to "supercharge hacking, blackmail, and influence campaigns." They explained that the national security threat arises precisely because RTB systems broadcast sensitive user data to numerous third parties with limited transparency and limited ability to control downstream use.

86.    The letter specifically sought information about which companies received bidstream data from Xandr, whether recipients were restricted from secondary use, and whether foreign-owned or foreign-headquartered entities obtained bidstream data associated with U.S. users.

87.    Despite this direct warning, Xandr has continued to operate an RTB system that broadcasts persistent identifiers and sensitive contextual data to numerous third parties on each

---

[42] Letter from Sen. Bill Cassidy to AT&T (Apr. 1, 2021), https://www.cassidy.senate.gov/wp-content/uploads/media/doc/040121%20Bidstream%20Letter%20to%20ATT.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

page load, enabling exactly the type of dossier-building and downstream misuse that Congress identified as a threat to consumer privacy and national security.

III.    **Xandr's Identity Synchronization With a CCP-Linked Chinese Company Results in Ongoing Transfers of Americans' Sensitive Data in Violation of Federal Law.**

    A.    **Xandr Actively Synchronizes Persistent Identifiers With Temu, a Chinese Company Subject to the Jurisdiction and Control of the Chinese Communist Party.**

88.    As part of its real-time bidding operations, Xandr maintains active identity synchronization integrations that permit the exchange of persistent identifiers with Temu, a Chinese e-commerce company owned by PDD Holdings, Inc. Temu launched its U.S. operations in September 2022 and has since become the subject of widespread concern from U.S. government officials, law enforcement agencies, and national security experts regarding its invasive data collection practices and ties to the Chinese Communist Party.

89.    In September 2024, Congressional Republicans on the House Permanent Select Committee on Intelligence formally requested briefings from the FBI and Securities and Exchange Commission regarding Temu and its parent company. The members stated that they were "concerned about the protection of Americans' data" and emphasized that, "[a]nalogous to Congress' action on TikTok, the relationship between the Chinese Communist Party, Chinese national security laws, and Americans data must be understood," further expressing concerns that the Chinese Communist Party may be attempting to exploit U.S. democratic institutions, free-market principles, and the personal and economic data of Americans.[43]

90.    In April 2024, multiple U.S. Senators wrote to President Biden about Temu's dangerous conduct.[44] U.S. Senator Tom Cotton argued that urgent action was needed to "protect

---

[43] Press Release, *LaHood, HPSCI Republicans Sound Alarm on Temu, Request Briefing from FBI and SEC*, House Permanent Select Committee on Intelligence (Sept. 25, 2024), https://intelligence.house.gov/2024/09/25/lahood-hpsci-republicans-sound-alarm-on-temu-request-briefing-from-fbi-and-sec/.

[44] Elaine Mallon & Washington Examiner, *GOP senators call on Biden administration to investigate popular Chinese marketplace websites*, Denver Gazette (Apr. 17, 2024),

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

every single American's personal privacy" from Temu's practice of "harvesting vast amounts of personal information from American consumers"[45] and its ties to the Chinese Communist Party. Around the same time, Congressman Brian Mast urged the FTC to investigate Temu's connections to the CCP.[46]

91.    In August 2024, Senator Rick Scott wrote to Secretary of Commerce Gina Raimondo urging the Department of Commerce to investigate the "CCP-linked" Temu, expressing serious concerns about data privacy, in addition to labor practices and product safety.[47] That same month, Attorneys General from twenty-one states sent a joint letter to Temu's president and PDD Holdings' CEO demanding that Temu disclose how it collects and stores consumer data and whether it sells that data to third parties.[48]

92.    Multiple independent analyses have confirmed the invasive nature of Temu's data collection practices. For example, in October 2024, the Center for Strategic and International Studies issued a report highlighting Temu's concerning data collection practices and its legal obligation to cooperate with Chinese intelligence agencies.[49]

93.    In July 2025, Kentucky Attorney General Russell Coleman filed a lawsuit against Temu, alleging that Temu illegally provides the Chinese government with access to Americans'

---

https://www.denvergazette.com/2024/04/17/gop-senators-call-on-biden-administration-to-investigate-popular-chinese-marketplace-websites-3354c847-f87c-5870-9c58-9dbf9ec96428/.
[45] Letter from Sen. Tom Cotton to President Joseph R. Biden (Apr. 15, 2024), https://www.nationalreview.com/wp-content/uploads/2024/04/temu_letter.pdf.
[46] Office of Rep. Brian Mast, *Mast Demands FTC Probe Temu for Alleged Ties to the Chinese Communist Party* (Apr. 17, 2024), https://mast.house.gov/2024/4/mast-demands-ftc-to-probe-temu-for-its-alleged-ties-to-ccp.
[47] Press Release, Sen. Rick Scott, *Sen. Rick Scott Urges Department of Commerce to Investigate CCP-Linked Temu* (Aug. 14, 2024), https://www.rickscott.senate.gov/2024/8/sen-rick-scott-urges-department-of-commerce-to-investigate-ccp-linked-temu.
[48] Letter from Att'ys Gen. of 21 States to Qin Sun (Temu) and Chen Lei (PDD Holdings) (Aug. 15, 2024), https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2024/temu-letter.pdf.
[49] Diane Rinaldo, *Looking Beyond TikTok: The Risks of Temu*, Center for Strategic and International Studies (Oct. 24, 2024), https://csis-website-prod.s3.amazonaws.com/s3fs-public/2024-10/241023_Rinaldo_Temu_Brief.pdf?VersionId=YHKZ_M7RQpFKe6Cy1hMeZ4OfCaJ9Nuyp.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

data.[50] Arkansas and Nebraska Attorneys General filed similar lawsuits alleging that Temu's mobile app functions as spyware designed to harvest Americans' personal information.[51]

94.    Despite the widely recognized national security risks posed by Temu and its documented data-collection practices, Xandr has knowingly maintained active technical integrations with Temu that enable the systematic transfer of Americans' persistent identifiers and related data through identity synchronization.

**B.    Xandr's Identity Synchronization Enables Temu to Track Millions of Americans Across the Internet.**

95.    Xandr has integrated Temu into its identity synchronization framework. As part of that integration, Xandr's code causes users' browsers to exchange identifiers with Temu's servers, transmitting Xandr's UUID identifier for the user to Temu and receiving Temu's own internal identifier for the same individual in return.

96.    During this identity synchronization process, Temu receives persistent identifiers tied to American users, along with associated IP addresses and other technical metadata, and links that information to its own internal user profiles. This creates a persistent linkage that allows Temu to recognize and track the same individual across Xandr's advertising ecosystem and across unrelated websites and digital contexts, even where the user has never visited or interacted with Temu's e-commerce platform.

---

[50] Kevin Grout, *Attorney General Coleman Files Lawsuit Against Chinese Shopping Platform Temu for Stealing Kentuckians' Data*, Kentucky Attorney General (July 17, 2025), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=1797.
[51] Press Release, *Attorney General Griffin Sues Chinese E-Commerce Company Temu for Deceiving Arkansans, Illegally Accessing Their Personal Information*, Arkansas Attorney General (June 25, 2024), https://arkansasag.gov/news-release/attorney-general-griffin-sues-chinese-e-commerce-company-temu-for-deceiving-arkansans-illegally-accessing-their-personal-information/. *See also* Press Release, *Attorney General Hilgers Files Lawsuit Against Temu for Siphoning Nebraskans' Phone Data*, Nebraska Attorney General Press Release (June 12, 2025), https://ago.nebraska.gov/attorney-general-hilgers-files-lawsuit-against-temu-siphoning-nebraskans-phone-data.

First Amended Class Action Complaint
Case no. 3:25-cv-07385-WHO

97.     More troubling still, once Temu has synchronized identifiers with Xandr, it can correlate that identifier linkage with bidstream data it receives from other participants in the RTB ecosystem.

98.     In the RTB ecosystem, dozens of advertising platforms routinely broadcast bid requests containing persistent identifiers, URLs, and behavioral segment data. Using the synchronized Xandr identifiers as a common key, Temu can match and aggregate this information across multiple sources. This allows Temu to piece together comprehensive profiles of American consumers' browsing behavior, interests, health concerns, and inferred characteristics—even though most of these users have never visited Temu's website or knowingly interacted with its services.

99.     Whether or not Temu receives behavioral segment data indirectly from Xandr, Xandr's transmission of persistent identifiers and IP addresses to Temu is itself prohibited by the BSD Rule, as explained below.

### C.     The BSD Rule Prohibits Xandr's Transmission of Americans' Persistent Identifiers to CCP-Linked Entities Like Temu.

100.     On April 8, 2025, the U.S. Department of Justice issued the BSD Rule, codified at 28 C.F.R. Part 202, to restrict the transfer of Americans' bulk sensitive personal data to "countries of concern"—including the People's Republic of China. The BSD Rule was promulgated pursuant to Executive Order 14117, which identified the unrestricted transfer of Americans' personal data to foreign adversaries as a national security threat.

101.     Under the BSD Rule, it is unlawful to engage in any "covered data transaction" that involves the transfer of "bulk U.S. sensitive personal data" or "bulk covered personal identifiers" to entities that are owned by, controlled by, subject to the jurisdiction of, or organized under the laws of a country of concern. 28 C.F.R. §§ 202.206, 202.210, 202.212. The rule applies specifically to transactions involving data brokerage and online advertising—the exact activities in which Xandr engages.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

102.    The U.S. government has determined that the export of Americans' behavioral data to hostile foreign regimes or entities under their jurisdiction constitutes an "'unusual and extraordinary threat . . . to the national security and foreign policy of the United States' that has been repeatedly recognized across political parties and by all three branches of government."[52]

103.    The BSD Rule defines "covered personal identifiers" to include persistent identifiers such as advertising IDs, device identifiers, and IP addresses. The rule establishes "bulk" thresholds that trigger liability: transfers involving data linked to more than 100,000 U.S. persons over a twelve-month period constitute prohibited bulk transfers. 28 C.F.R. §§ 202.205, 202.211.

104.    The BSD Rule illustrates examples of prohibited conduct that directly parallel Xandr's practices. One example describes a scenario in which a U.S. company that sells advertising space provides IP addresses and advertising identifiers associated with more than 100,000 U.S. persons to an advertising exchange located in a country of concern over a 12-month period. 28 C.F.R. § 202.214(b)(4). The rule explains that this constitutes a covered data transaction involving data brokerage and is unlawful because IP addresses and advertising identifiers, when transferred in bulk, qualify as bulk covered personal identifiers.

105.    That is precisely what Xandr does. As part of operating its advertising exchange and facilitating identity synchronization, Xandr initiates the transmission of data packets that include U.S. users' persistent advertising identifiers—specifically, UUID identifiers—and IP addresses to Temu, an entity operating under the jurisdiction of the People's Republic of China. These transmissions occur regularly, at massive scale, affecting millions of American users and vastly exceeding the BSD Rule's 100,000-person bulk threshold.

**D.     Xandr's Ongoing Data Transfers Enable Foreign Surveillance, Exploitation, and Coercive Influence Over Americans.**

---

[52] Press Release, *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data*, U.S. Department of Justice (Apr. 11, 2025), https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-program-protect-americans-sensitive.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

106.    The danger addressed by the BSD Rule is not hypothetical or speculative. When persistent identifiers and detailed behavioral data are transferred in bulk to entities subject to the jurisdiction of a foreign adversary, those entities can aggregate the data into detailed dossiers about U.S. residents. Such dossiers can reveal individuals' health conditions, financial vulnerabilities, personal relationships, political views, physical locations, and psychological characteristics over time.

107.    In the hands of an adversarial foreign government or its proxies, this information can be weaponized to identify and exploit individual Americans. Foreign intelligence services can use behavioral profiles to:

> a.    Identify Americans in sensitive positions—such as government employees, military personnel, intelligence officers, judges, law enforcement officials, or corporate executives—based on their online activity, location patterns, and institutional affiliations;
>
> b.    Target individuals for coercion, blackmail, or influence operations by identifying personal vulnerabilities such as financial distress, health conditions, addictions, or behavioral patterns that could be exploited;
>
> c.    Conduct surveillance of specific populations, including political activists, journalists, dissidents, human rights advocates, or members of diaspora communities who may be critical of the Chinese government; and
>
> d.    Build predictive models of American consumer behavior, political sentiment, public health trends, and social movements that can inform strategic decision-making by foreign governments seeking to undermine U.S. interests.

108.    It is precisely this capacity to transform bulk advertising data into tools for surveillance, exploitation, and coercive influence that the BSD Rule was enacted to prevent—and that Xandr's continued transmissions to Temu directly enable.

First Amended Class Action Complaint
Case no. 3:25-cv-07385-WHO

109. Xandr has knowingly continued routing Americans' sensitive user data to Temu even after the BSD Rule took effect on April 8, 2025, and even after widespread public reporting, congressional investigations, and state lawsuits documenting Temu's national security risks and invasive data practices.

### E. Xandr Knowingly Engaged in Prohibited Data Transfers Despite Clear Warnings.

110. Xandr is not a passive or uninformed actor in the digital advertising ecosystem. It is a member of multiple industry groups—including the Network Advertising Initiative—that actively participated in the rulemaking process leading to the U.S. Department of Justice's adoption of the BSD Rule. In public comment letters submitted to DOJ during the rulemaking period, these trade associations specifically warned that common adtech practices—such as behavioral profiling, cookie syncing, and real-time bidding with foreign demand-side platforms—could violate the BSD Rule if data was transmitted to entities linked to foreign adversaries like China.

111. Xandr's awareness of this legal risk is further reflected in corporate disclosures made by its parent company. In Microsoft's 2024 Annual Report (Form 10-K), the company warned investors that its advertising operations are subject to rapidly evolving privacy and data transfer regulations, including cross-border restrictions that could materially impact business operations. As a wholly owned Microsoft subsidiary, Xandr is subject to centralized legal oversight, and its business practices are shaped by shared infrastructure, policies, and contractual standards across Microsoft's advertising ecosystem.

112. In the wake of the BSD Rule's implementation, Microsoft amended its standard partner contracts to include explicit representations and warranties regarding BSD Rule compliance. Microsoft now requires its advertising partners to certify that they are not "covered persons" under the BSD Rule and to represent that they will not engage in "covered data transactions" involving bulk U.S. sensitive personal data or government-related data.

29

113.    However, the mere inclusion of contractual language in Microsoft's boilerplate advertising agreements is legally and operationally insufficient to ensure compliance or avoid liability. Such clauses do nothing to prevent violations where Microsoft or Xandr themselves initiate the bulk data transfers or maintain technical integrations with known covered entities. Under the BSD Rule, liability is not limited to the foreign recipient of the data—it extends to any U.S. person or entity that knowingly engages in a covered data transaction by transferring restricted data to a country of concern.

114.    Xandr's knowledge and intent are further evidenced by the selective manner in which it publicly discloses its third-party data relationships. Microsoft maintains a public list of third-party data providers and partners associated with Xandr's advertising ecosystem, including entities involved in data sharing and user-identifier synchronization. Temu does not appear on that list, despite the fact that Xandr regularly synchronizes persistent identifiers with Temu, as described above.

115.    Despite clear guidance from the DOJ, widespread warnings from U.S. government officials and law enforcement, Microsoft's own updated contractual language, and multiple lawsuits alleging that Temu functions as spyware for the Chinese government, Xandr has continued to transmit sensitive user data to Temu. Xandr's conduct is not accidental, peripheral, or the result of isolated technical missteps.

116.    By maintaining active identity synchronization integrations with Temu—a company that has been specifically identified by congressional intelligence committees, state attorneys general, and federal lawmakers as a threat to national security—Xandr has knowingly facilitated the export of Americans' behavioral data to a foreign adversary.

117.    In doing so, Xandr has disregarded regulations enacted specifically to address what the U.S. government has called an "unusual and extraordinary threat" to the national security and foreign policy of the United States.[53]

## IV.    Consumers Lack Notice, Choice, or the Ability to Consent to Xandr's Surveillance and Data Transfers.

118.    Consumers have never heard of Xandr, have no relationship with Xandr, and have no way of knowing when Xandr is intercepting their communications. When visiting websites, users see only the publisher's domain and content. Xandr's presence is invisible—concealed in background code that executes automatically without any user-facing indication.

119.    Even if a consumer somehow learned of Xandr's existence and sought to understand its data practices or exercise privacy rights, Xandr has made that functionally impossible. Xandr's corporate website provides no clear path to privacy policies, opt-out mechanisms, or user controls.

120.    One Xandr webpage, shown in Figure 2 below, purports to offer information about consumers' privacy choices and apparently provides the ability to opt out of data collection.



**(Figure 2.)**

Unfortunately for any consumer who manages to locate this obscure webpage, the opt-out link leads to a broken page, as shown in Figure 3 below.



---

[53] Press R_____ *Protect*
*America_____*
https://w_____*rogram-*
protect-a_____

FIRST A_____
CASE N_____

1

2

3

4

5

6

7

8

9

**(Figure 3.)**

10    121.    Rather than providing consumers with meaningful notice or control, Xandr attempts

11  to disclaim responsibility for misuse of sensitive data by imposing contractual restrictions on its

12  advertising partners. For example, Xandr's documentation states that advertisers in certain sensitive

13  industries "may not use individuals' demographics—such as age, gender, relationship status or

14  precise location—for the purpose of personalizing advertising, segmenting, or profiling

15  customers."[54] These contractual restrictions are unenforceable theatrics that do nothing to protect

16  consumers.

17    122.    First, these restrictions appear only in documentation for advertisers—not in any

18  notice or agreement presented to the consumers whose data is being collected and exploited.

19  Consumers are not parties to these contracts, have no ability to enforce them, and in most cases

20  have no knowledge they exist.

21    123.    Second, these purported restrictions are contradicted by Xandr's own business

22  practices. As detailed above, Xandr itself maintains at least 650,000 audience segments—including

23  highly sensitive categories based on health conditions, political views, sexual orientation, and

24  economic vulnerability—and actively facilitates the use of these segments in real-time ad auctions.

25

26

27

[54] *Microsoft Monetize – Set up segment targeting on a line item*, Microsoft Learn (Oct. 21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/set-up-segment-targeting-on-a-line-item.

28  FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

Xandr cannot seriously purport to prohibit the "profiling" of consumers when its entire platform is built on profiling consumers.

124.    Third, contractual promises between adtech companies are an insufficient safeguard for consumer privacy. As the FTC has explained, "Honoring privacy promises and obligations means implementing and adhering to safeguards that actually maintain people's privacy. Promises and contract clauses are important, but they must be backed up by action."[55]

125.    Once Xandr broadcasts sensitive user data through its RTB system to dozens of third-party recipients, it has little to no ability to recall that data or prevent downstream misuse. This leaves users' sensitive data to be misused, resold, or repurposed—particularly when made available in bulk to third parties looking to exploit sensitive user data, or who lack adequate safeguards or internal controls.

126.    Users who visit websites to research serious medical conditions, seek mental-health or addiction support, explore reproductive-health decisions, or engage in political organizing reasonably expect to communicate with the site they chose—not to have those communications silently intercepted and monetized by an undisclosed surveillance intermediary that builds persistent dossiers exposing their health status, beliefs, and personal vulnerabilities.

127.    By concealing its surveillance, failing to provide effective notice or disclosures, and offering no meaningful way to opt out, Xandr deprives users of any informed choice. Users are unaware that their sensitive browsing behavior is being intercepted, profiled, and transmitted through real-time auctions to dozens or hundreds of third parties with each page view, and they have no practical ability to avoid Xandr's surveillance while engaging in ordinary internet use.

---

[55] *FTC Cracks Down on Mass Data Collectors: A Closer Look at Avast, X-Mode, and InMarket*, Fed. Trade Comm'n (Mar. 4, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/03/ftc-cracks-down-mass-data-collectors-closer-look-avast-x-mode-inmarket.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

128.    This total lack of visibility, transparency, and meaningful control is incompatible with widely recognized principles of privacy and data protection—and fundamentally at odds with consumers' reasonable expectations of privacy.

## FACTS SPECIFIC TO PLAINTIFF PORCUNA

129.    Plaintiff Marissa Porcuna is a resident of California. Following a medical diagnosis in 2013, Plaintiff Porcuna has regularly used the internet to research personal health topics and access support communities. In June 2025, Plaintiff Porcuna visited the website diabetesforum.com, a health-focused forum where users discuss chronic illness, medical treatments, and related concerns.

130.    Unknown to Plaintiff Porcuna, Xandr's code is deployed on diabetesforum.com. This code has been designed by Xandr to collect and share the personal information and browsing data of users with numerous third parties and to intercept users' communications with the website. Plaintiff Porcuna was one such user whose information has been intercepted, compiled, and shared without her consent.

131.    While Plaintiff Porcuna was actively viewing pages on diabetesforum.com, her browser loaded Xandr's JavaScript code that was embedded on the site. This code executed silently and automatically during the page-load process, without any additional action by Plaintiff Porcuna. Xandr's code triggered an identity sync to de-anonymize Plaintiff Porcuna's data across multiple identity providers, enhancing the ability of Xandr and other third parties to recognize and track Plaintiff Porcuna across the internet on an ongoing basis. At the same time, Xandr's code initiated automated bid requests sent from Plaintiff Porcuna's browser to Xandr's servers as part of the real-time bidding auction that monetized her profile even as she accessed online health-related support.

132.    These Xandr-initiated bid requests featured persistent identifiers uniquely associated with Plaintiff Porcuna—including her cookie IDs, device IDs, IP addresses, and browser metadata—along with the full URL of the specific health-related page that Plaintiff Porcuna was viewing at the time.

133.    Xandr then enriched these bid requests with other data before sending the data to purchasers of ad inventory. Bid requests of this form generally included behavioral segment data, which further indicated and revealed Plaintiff Porcuna's health interests and vulnerabilities, even beyond what is revealed by the URL itself.

134.    These segments, together with the page-level context, were broadcast to dozens of adtech entities participating in Xandr's real-time bidding auction. As a result, these companies received detailed information about Plaintiff Porcuna's online behavior and health-related interests in real time, without her knowledge or consent.

135.    In addition, Xandr initiated user-synchronization with Temu, a Chinese e-commerce platform linked to the Chinese Communist Party, which transmitted Plaintiff Porcuna's persistent identifiers—including IP address, advertising identifiers, and cookie data—to Temu servers.

136.    Xandr's covert tracking and sharing of Plaintiff Porcuna's sensitive data violates her reasonable expectation of privacy. This data, particularly when appended to persistent profiles, reveals intimate details about her life. Plaintiff Porcuna did not reasonably expect that her behavioral and profile data would be broadly disseminated to third parties, or that her persistent identifiers would be synchronized with infrastructure associated with a foreign adversary.

137.    Aggregating and monetizing this information without Plaintiff Porcuna's knowledge or consent goes far beyond what any reasonable consumer would expect and constitutes a serious intrusion into private life.

138.    Plaintiff Porcuna did not consent to the interception, profiling, enrichment, or foreign transmission of her browsing data. Xandr's conduct caused and continues to cause Plaintiff Porcuna concrete and particularized harm, including the unauthorized disclosure of sensitive personal information to a foreign entity, the invasion of her privacy, and the loss of control over how and where sensitive information about her life was shared and used.

First Amended Class Action Complaint
Case no. 3:25-cv-07385-WHO

## FACTS SPECIFIC TO PLAINTIFF ALEXANDER

139.    Plaintiff Gena Alexander is a resident of California. Plaintiff Alexander regularly uses the internet to research health-related topics and to access educational resources concerning medical conditions and wellness. In March 2025, September 2025, and October 2025, Plaintiff Alexander visited the website healthline.com, a widely used health information platform that publishes articles concerning medical conditions, treatments, symptoms, and health-related guidance.

140.    Unknown to Plaintiff Alexander, Xandr's code is deployed on healthline.com and has been designed by Xandr to collect and share the personal information and browsing data of users with numerous third parties and to intercept users' communications with the website. Plaintiff Alexander was one such user. Her information was intercepted, combined with other data, and shared without her permission.

141.    While Plaintiff Alexander was actively viewing health-related pages on healthline.com, her browser loaded Xandr's JavaScript code that was embedded on the site. This code executed silently and automatically during the page-load process, without any additional action by Plaintiff Alexander. Xandr's code triggered identity-syncing mechanisms designed to link Plaintiff Alexander's data across multiple identity providers, enhancing the ability of Xandr and other third parties to recognize and track Plaintiff Alexander across the internet on an ongoing basis. At the same time, Xandr's code initiated automated bid requests sent from Plaintiff Alexander's browser to Xandr's servers. Through this process, Xandr monetized Plaintiff Alexander's profile even as she accessed sensitive online health-related information.

142.    These Xandr-initiated bid requests contained persistent identifiers uniquely associated with Plaintiff Alexander, including cookie identifiers, device identifiers, IP address information, and browser and device metadata, together with the full URLs, keywords, and other page-level context of the specific Healthline pages Plaintiff Alexander was viewing at the time. The URLs and contextual signals transmitted to Xandr revealed sensitive health-related topics reflected in the content Plaintiff Alexander was reading.

36

143.    Xandr enriched these bid requests with additional data before broadcasting them to purchasers of advertising inventory participating in its real-time bidding auctions. Bid requests of this form standardly include behavioral segment data that further describes and categorizes the user's inferred interests, health concerns, and vulnerabilities beyond what is already apparent from the detailed URL alone.

144.    Xandr's covert interception, enrichment, and dissemination of Plaintiff Alexander's sensitive browsing data violated and continues to violate her reasonable expectation of privacy. When aggregated and appended to persistent user profiles, this data reveals intimate details about Plaintiff Alexander's private life, including her health-related interests and concerns. Monetizing and distributing this information without her knowledge or consent goes far beyond what any reasonable consumer would expect.

145.    Plaintiff Alexander did not consent to the interception of her electronic communications, the enrichment of her browsing data with behavioral segments, or the dissemination of her browsing data to third parties for advertising and profiling purposes. Xandr's conduct caused and continues to cause Plaintiff Alexander concrete and particularized harm, including the invasion of her privacy and the loss of control over how and where her sensitive health-related browsing activity was shared, retained, and used.

## CLASS ACTION ALLEGATIONS

146.    **Class Definitions**: Plaintiffs bring this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and the BSD Class, and a California Class of all others similarly situated (together, the "Classes"), defined as follows:

**BSD Class**: All individuals in the United States using a website or application incorporating Xandr's tracking technology whose personal information was transmitted to Temu on or after April 10, 2025.

**California Class**: All individuals located in California whose personal information or information derived therefrom Xandr used to create, maintain, or share a profile made available through the Xandr platform.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

147. **Numerosity**: The exact number of members in the Classes are unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. Defendant has many thousands of internet users who fall into the definition of the Classes. Members of the Classes can be identified through Defendant's records and by reference to other objective criteria.

148. **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for members of the Classes include, but are not necessarily limited to the following:

a. Whether Defendant intentionally violated the privacy rights of Plaintiffs and members of the Classes;

b. Whether Defendant's identity syncing technology caused the unlawful collection and dissemination of the personal data of Plaintiffs and members of the Classes;

c. Whether Defendant used tracking technologies to cause users' web browsers to reroute electronic communications or other data—including URLs, metadata, and behavioral activity—to Defendant;

d. Whether Defendant tracked website visitors and caused details about internet users' visits to websites and other private behavior to be intercepted and paired with other personal information about such persons, and disseminated and shared with

38

third parties, including entities controlled by adversaries of the United States, without their knowledge or consent;

e.    Whether Defendant used a device, as defined under 18 U.S.C. § 2510(5), to intercept the contents of communications from Plaintiffs and the Classes;

f.    Whether Defendant obtained valid consent from Plaintiff and the Classes to intercept and disclose their electronic communications or personal data to third parties;

g.    Whether Defendant tortiously intercepted or otherwise gathered and used the communications and personal data of Plaintiffs and members of the Classes;

h.    Whether Defendant's interception and disclosure of communications from Plaintiffs and the Classes fall within the ECPA's crime-tort exception to the party-exception provision; and

i.    For the California Class, whether Defendant's conduct violated the California Constitution or intruded upon the privacy rights of California residents.

149.    **Typicality**: Plaintiffs' claims are typical of the claims of members of the Classes. The claims arise from a common nucleus of operative fact—inter alia, the surreptitious interception and illicit collection and sharing of their personal information. Plaintiffs Porcuna and Alexander, like all members of the Classes, had their information unlawfully collected and shared and have been injured by Defendant's misconduct at issue.

150.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes. That is, Plaintiffs and the members of the Classes sustained injuries and damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

the financial resources to do so. Neither Plaintiffs nor their counsel have any conflicts with or interests adverse to the Classes.

151.    **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

152.    Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and in discovery.

<u>**FIRST CAUSE OF ACTION**</u>
**Intrusion Upon Seclusion Under California Common Law**
**(On behalf of Plaintiffs and the California Class)**

153.    Plaintiffs and the California Class Members incorporate the foregoing allegations as if fully set forth herein.

154.    Plaintiffs and the California Class Members have a strong interest in preventing the unauthorized collection, aggregation, and dissemination of their most personal information. Plaintiffs and the California Class also have a strong interest in preventing the compilation and widespread distribution of detailed cradle-to-grave consumer profiles to unknown third parties without their knowledge or consent.

155.    These individuals maintain a reasonable expectation of privacy in their day-to-day lives—an expectation that extends not only to their internet browsing activity and online communications, but also to the personal data that Xandr surreptitiously collects, enriches, de-

40

anonymizes, and sells without the knowledge or consent of Plaintiffs and the California Class Members.

156.    Xandr intentionally violates Plaintiffs' and the California Class Members' reasonable expectation of privacy through its covert collection, aggregation, correlation, and dissemination of sensitive information and profiles tied to Plaintiffs and the California Class Members as alleged herein.

157.    Xandr's business model depends upon the development and offering for sale of increasingly intimate and identifiable consumer profiles. To this end, Xandr's technologies are designed to collect, analyze, monetize and share sensitive consumer data for targeted advertising and user profiling. Xandr conducts real-time surveillance of users engaging with deeply personal content—such as online support groups for private health conditions—capturing a broad array of sensitive data.

158.    Xandr intentionally and extensively violates the reasonable expectation of privacy held by Plaintiffs and the California Class Members through engaging in covert, large-scale data collection designed to uniquely identify and surveil individuals. This extensive aggregation, synthesis, and sale of comprehensive online data would be highly offensive to a reasonable person and constitutes an egregious breach of social norms.

159.    Xandr covertly harvests and correlates personal information, enriches that data with additional details, and builds highly detailed consumer profiles unique to each individual. Xandr leverages direct data collection, first-party Microsoft data and identity graphs, and its partnerships with third-party data providers to create intimate, identifiable profiles on the individuals it covertly tracks.

160.    These enriched profiles are then shared for profit with potentially thousands of undisclosed third parties through the RTB process. These unknown third parties are then empowered to target individuals based on sensitive behavior and inferred characteristics. These cradle-to-grave consumer profiles become more personalized—and therefore more valuable—the

longer they are shared and updated. As they become increasingly personalized, the more trivial it becomes to infer or re-attach a real-world identity to these profiles.

161.    Collecting detailed information about a person's device, behavior, or website usage while they engage with deeply personal content—such as a site dedicated to the discussion of a chronic illness—is inherently intrusive. Most people would be shocked to learn that simply opening a webpage could trigger real-time data harvesting and the silent creation of a detailed behavioral profile tied to their identity. This covert surveillance and subsequent profiling would be highly offensive to a reasonable person and constitutes a profound violation of social norms.

162.    Xandr does not collect isolated data points from Plaintiffs and California Class Members. It stockpiles a vast range of personal information, including persistent identifiers (e.g., cookie IDs, device IDs, mobile advertising IDs, and IP addresses), device metadata (e.g., screen resolution, browser version, operating system, and language settings), and contextual information such as full URLs and query parameters. This contextual data often reveals the exact content being viewed on the page (such as the position the user's browser is scrolled to) by the individual at the very moment Xandr broadcasts the data to bidders.

163.    Through these practices, Xandr intercepts, tracks, collects, aggregates, and redistributes the internet activity and communications of Plaintiffs and California Class Members. Xandr's identity-syncing processes link user identifiers across websites and devices, facilitating persistent cross-site tracking and user recognition. This allows Xandr to link activity across websites and sessions and compile a detailed, persistent profile that follows individuals across the internet.

164.    By combining its central role in the RTB ecosystem with technologies like JavaScript trackers, Prebid.js adapters, and identity-syncing endpoints, Xandr compiles and constantly refines a vast repository of personal data, including the attributes, internet activity, and communications of Plaintiffs and California Class Members.

165.     This widespread surveillance and distribution of personal data occurs without meaningful disclosure and defies users' reasonable expectations of privacy. No reasonable user would expect that a company like Xandr—a company most consumers have never heard of—would track, compile, and sell sensitive information about their health concerns and other private information to a vast network of unknown companies.

166.     Xandr does more than record user activity across the internet. Xandr exploits and analyzes vast troves of data to generate inferences about the consumer, including likely interests, health-related concerns, financial condition, and other personal characteristics. This behavioral analysis enables Xandr to create or assign segments to users—classifications that allow Xandr and its downstream partners to categorize each user in a highly personalized manner. These detailed segments are not based only on demographic information but may also be based on deeply sensitive attributes like mental or physical health conditions, financial distress, political views, disability, and religious beliefs. In addition to segments derived from its own data, it also assigns segments to users based on a large number of data partnerships, essentially commoditizing the act of profiling and tracking users across the web.

167.     These segments are shared alongside uniquely identifying information, providing not just a detailed snapshot of the user's traits but the ability to permanently tie those traits to an infinitely expandable and re-shareable profile on that individual. Xandr shares these highly personalized profiles, including detailed segment data, with potentially thousands of unknown third parties. The information is distributed in real time and may also be retained by these downstream partners, creating additional copies of these profiles that can be used, enhanced, and re-shared indefinitely. By facilitating this process, Xandr not only violates Plaintiffs' and California Class Members' reasonable expectation of privacy but also empowers downstream entities to do the same.

168.     Xandr leverages its position in the RTB ecosystem to gain covert and unwanted access to the data of Plaintiffs and members of the California Class. Compiling that information

43

into detailed consumer profiles that serve as long-term records of an individual's behavior over time, then enabling advertisers and data brokers to tie those profiles to real-world identities, is highly offensive. Sharing those cradle-to-grave consumer profiles—containing behavioral and potentially identifying data—with a global network of bidders for profit, on an ongoing basis, is highly offensive.

169.    When a third party participates in an RTB auction through Xandr's exchange, it receives behavioral segment data, persistent identifiers, and the context of the web page being viewed. This allows the third party not only to serve targeted ads but also to retain and analyze that information for future use, thereby gaining deep, long-term visibility into users' habits, interests, and vulnerabilities.

170.    Despite the dangers of sharing this unlawfully gathered data, Xandr knowingly shares sensitive information—including Plaintiffs' and California Class Members' browsing activity, behavioral insights, and personal identifiers—with countless third parties.

171.    The extent of Xandr's collection, enrichment, and redistribution of highly detailed consumer profiles is staggering and highly offensive. Xandr's large-scale development and disclosure of extensive consumer profiles for commercial gain represents an egregious breach of social norms and violates the reasonable expectation of privacy held by Plaintiffs and the California Class Members. Xandr lacks any legitimate business interest in covertly tracking, profiling, and aggregating the identities and private information of Plaintiffs and the California Class Members.

172.    As a result of these extensive and intentional invasions of privacy, Plaintiffs and the California Class Members have suffered harm and are entitled to just compensation and injunctive relief.

**SECOND CAUSE OF ACTION**
**Invasion of Privacy Under the California Constitution**
**(On behalf of Plaintiffs and the California Class)**

173.    Plaintiffs and the California Class Members incorporate the foregoing allegations as if fully set forth herein.

44

174.    Article I, section one of the California Constitution guarantees to every California citizen the inalienable right to privacy.

175.    Plaintiffs reallege and incorporate by reference the factual allegations set forth in ¶¶ 153–172, which describe Xandr's intentional, highly offensive invasion of Plaintiffs' reasonable expectation of privacy, and which independently satisfy the elements of a claim under Article I of the California Constitution.

176.    As a result of Xandr's intentional violations of Plaintiffs' and the California Class Members' constitutional right to privacy under the California Constitution, Plaintiffs and the California Class Members have suffered legally cognizable harm and are entitled to just compensation and injunctive relief.

### THIRD CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631(a)**
**(On behalf of Plaintiffs and the California Class)**

177.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

178.    Plaintiffs bring this claim on behalf of themselves and the California Class under the California Invasion of Privacy Act ("CIPA"), codified in California Penal Code sections 630–638.

179.    California Penal Code § 631(a) prohibits, in pertinent part:

Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

45

180.    Defendant Xandr knowingly and willfully distributes and maintains and uses tracking scripts, pixels, and header bidding infrastructure on third-party websites for the purpose of duplicating and diverting user communications to Xandr's own servers and those of third parties. Xandr's technologies intentionally capture the contents of users' interactions with these websites and purposefully transmit them to Xandr and its many integrated demand-side partners.

181.    Xandr's technologies, including tracking scripts, pixels, and header bidding infrastructure, constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, Xandr's deliberate and willful operation of these technologies to facilitate its interceptions falls under the CIPA's statutory catch-all category of "any other manner" of tapping or making an unauthorized connection.

182.    Xandr's tracking code—JavaScript embedded in the source code of partner websites—executed automatically within Plaintiffs' and California Class Members' browsers during the page load process, contemporaneously with their communications with the website. This code intercepted the contents of Plaintiffs' and California Class Members' interactions with those websites by duplicating and redirecting first-party communications—including full URLs, page titles, and a taxonomical classification of the content of the page—to Xandr and other third parties. These interceptions occurred as part of the browser's rendering sequence, before Plaintiffs or members of the California Class could detect, review, or prevent the transmissions.

183.    As users like Plaintiffs Porcuna and Alexander and the California Class Members navigate websites such as diabetesforum.com and healthline.com, Xandr's JavaScript code causes their browsers to transmit full URLs, page titles, and other page-level metadata to Xandr's servers in real time. These transmissions occur without the user's awareness or consent and are initiated automatically during the same browser session in which the user communicates with the website.

184.    The data intercepted by Xandr from Plaintiffs and California Class Members includes full-page URLs. Xandr reads and redistributes the URL and related contextual information

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

as part of the RTB auction process, learning the contents and context of these communications by Plaintiffs and members of the California Class before the webpage has even finished loading.

185.    Xandr's unlawful interception of communications occurred in a manner that was not authorized by Plaintiffs or California Class Members, who did not consent to Xandr's tracking, compilation, or use of their identity and communications content across the internet.

186.    Plaintiffs Porcuna and Alexander and members of the California Class suffered harm as a result of Defendant's violations of the California Invasion of Privacy Act and seek injunctive relief and statutory damages in the amount of $5,000 per violation pursuant to California Penal Code section 637.2(1).

### FOURTH CAUSE OF ACTION
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2510, *et seq*.**
**(On behalf of Plaintiff Porcuna and the BSD Class, and on behalf of Plaintiffs and the California Class)**

187.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

188.    The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication[.]" 18 U.S.C. § 2511(1)(a).

189.    **Intentional Interception**: Defendant Xandr knowingly and intentionally distributes and maintains and uses tracking scripts, pixels, and header bidding infrastructure on third-party websites for the purpose of rerouting user communications to Xandr's own servers and those of third parties. Xandr's technologies intentionally capture the contents of users' interactions with these websites and purposefully transmit them to Xandr and its integrated demand-side partners, including foreign buyers. Xandr's tracking code—JavaScript embedded in the source code of partner websites—executed automatically within Plaintiffs and members of the Classes' browsers during the page load process. This code intercepted the contents of Plaintiffs' and members of the Classes' interactions with those websites by rerouting first-party communications—including full URLs, page titles, and a taxonomical classification of the content of the page—to Xandr and other

47

third parties. These interceptions occurred as part of the browser's rendering sequence, before Plaintiffs or members of the Classes could detect, review, or prevent the transmissions.

190.    As users like Plaintiffs and members of the Classes navigate websites such as diabetesforum.com and healthline.com, Xandr's JavaScript code causes their browsers to transmit full URLs, page titles, and other page-level metadata to Xandr's servers in real time. These transmissions occur without the user's awareness or consent and are initiated automatically during the same browser session in which the user communicates with the website. Xandr's capture of these communications constitutes an unlawful interception under the ECPA.

191.    **Contents of a Communication**: The data intercepted by Xandr from Plaintiffs and members of the Classes includes full-page URLs. These qualify as the "contents" of a communication under 18 U.S.C. § 2510(8) because they reveal the substance and subject matter of the user's communications with the host website.

192.    **Use of a Device**: The technologies Xandr uses to intercept this data—including JavaScript, tracking pixels, and header bidding scripts—constitute "devices" under 18 U.S.C. § 2510(5), which includes any device or apparatus used to intercept electronic communications.

193.    **Lack of Consent**: Plaintiffs and members of the Classes did not consent to Xandr's interception or disclosure of their communications. Xandr did not provide clear or conspicuous notice that user interactions with publisher websites would be surveilled and routed to foreign entities, and Plaintiffs and members of the Classes lack a reasonable means to detect, prevent, or opt out of Xandr's data collection and sharing. There was no actual or implied consent under applicable law, as no reasonable person would agree to having secret cradle-to-grave consumer profiles built about them, or to have their personal information diverted to a foreign adversary.

194.    **Application of the Crime-Tort Exception on Behalf of the BSD Class**: Even if Xandr were deemed a party to these communications, which it is not, the "party exception" in 18 U.S.C. § 2511(2)(d) does not apply. At the time of the interception, Xandr's interception and use of these communications was undertaken knowingly and intentionally for the independent purpose of

committing criminal and tortious acts: with respect to the Plaintiff Porcuna and the BSD Class, the unlawful transmission of bulk U.S. sensitive personal data to a covered foreign entity in violation of the BSD Rule, 28 C.F.R. Part 202.

195.    On or after April 8, 2025, Xandr knowingly engaged in prohibited data-brokerage transactions with Temu, a foreign-owned entity with its principal place of business in China, in violation of the BSD Rule. 28 C.F.R. § 202.301(a).

196.    Xandr is a corporation organized and existing under the laws of Delaware, with its principal place of business located in the State of Washington. Because Xandr, Inc. is organized under the laws of the United States and is an entity in the United States, Xandr is a "U.S. person" under 28 C.F.R. § 202.256.

197.    Temu qualifies as a "covered person" under 28 C.F.R. § 202.211(a) because it is operated and controlled by PDD Holdings Inc., a Chinese company with substantial operations and executive oversight in the People's Republic of China—a "country of concern" under the BSD Rule. Although PDD Holdings nominally lists its principal executive offices in Ireland, it maintains a significant presence in China and is subject to Chinese law, including China's National Intelligence Law, Cybersecurity Law, and Data Security Law. These laws compel Chinese companies and individuals to secretly cooperate with government surveillance efforts and grant authorities unrestricted access to private user data. Temu's operations are subject to Chinese government control, oversight, and compelled disclosure obligations.

198.    On websites such as diabetesforum.com visited by Plaintiff Porcuna, and the websites visited by members of the BSD Class, Xandr initiates identity synchronization requests with Temu infrastructure—including requests to URLs such as https://temu.com/api/adx/cm/pixel-xandr—which result in the transmission of numerous protected "listed identifiers" under the BSD Rule, including but not limited to IP addresses (28 C.F.R. § 202.234(g)), advertising IDs (28 C.F.R. § 202.234(e)), and cookie data (28 C.F.R. § 202.234(g)).

199.    Xandr transmits these protected identifiers together, including, for example, transmitting a given user's IP address along with the user's cookie data and Xandr's advertising ID, such that the identifiers are clearly linked with one another and are associated or reasonably capable of being associated with each related user.

200.    While the above already represents a significant violation of user privacy, on information and belief, the full scope of user data that Defendant transmits to Temu—enabled through standard identifiers in real-time bidding—goes well beyond what an end user can directly observe. On information and belief, server-to-server communications between Xandr and Temu transmit information such as device IDs (28 C.F.R. § 202.234(c)), user behavioral signals, and a multitude of other advertising identifiers, all made available to Temu to further refine its consumer profiles.

201.    This information qualifies as "covered personal identifiers" and "sensitive personal data" under the BSD Rule because these identifiers are shared with Temu 1) in combination with at least one other listed identifier, or 2) in combination with other data such that the listed identifier is or can reasonably be associated with other listed identifiers or other sensitive personal data. 28 C.F.R. §§ 202.212(a), 202.249(a).

202.    On information and belief, Xandr has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons (including Plaintiff Porcuna and the BSD Class Members) following the effective date of the BSD Rule, and therefore this information constitutes "bulk U.S. sensitive data" under 28 C.F.R. § 202.206.

203.    On information and belief, Xandr provides this information to Temu as part of commercial transactions between the two entities. Temu itself did not collect or process this data directly from the relevant individuals, and Xandr's provision of this bulk U.S. sensitive data to Temu, a covered person, constitutes a "covered data transaction involving data brokerage" under 28 C.F.R. §§ 202.210, 202.214, and 202.214(b)(4)-(9).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

204.     Xandr is a sophisticated entity in the digital advertising industry. It is a member of industry associations that directly participated in the BSD Rule rulemaking process and publicly warned members of the legal risks of transmitting certain data to entities based in China. Xandr also acknowledged in its own SEC filings that it actively monitors privacy and data transfer regulations. For these reasons, Xandr knew or reasonably should have known that it had engaged and was engaging in covered data transactions involving data brokerage in violation of the BSD Rule.

205.     Because Xandr knowingly engaged and engages in covered data transactions involving data brokerage with Temu, a covered person, Xandr has violated the BSD Rule's prohibition of data-brokerage transactions under 28 C.F.R. § 202.301(a).

206.     Because Xandr intentionally and knowingly intercepted and disclosed Plaintiff Porcuna's and the BSD Class Members' communications for the purpose of committing these criminal and tortious acts, it is not shielded by the "party exception" under the ECPA.

207.     **Application of the Crime-Tort Exception on Behalf of the California Class**: At the time of the interception, Xandr's interception of the at-issue communications was knowingly and intentionally performed for the independent purpose of committing tortious acts in violation of California common law, specifically:

> a.     Committing the tort of intrusion upon seclusion under California common law by using the contents of the intercepted communications to facilitate the creation of highly detailed consumer profiles on Plaintiffs and California Class, which were then used and disseminated as described herein; and
>
> b.     Violating the right to privacy conferred by the California Constitution through the creation and dissemination of highly detailed consumer profiles, enriched by the contents of Plaintiffs' and the California Class Members' communications intercepted by Xandr, as described herein.

51

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO

208.    Because Xandr intentionally and knowingly intercepted and disclosed Plaintiffs' and California Class Members' communications for the purpose of committing these tortious acts, it is not shielded by the "party exception" under the ECPA.

209.    Plaintiffs and the Classes have suffered, and continue to suffer harm as a result of Defendant's violations of the ECPA, including the transmission of Plaintiff Porcuna's sensitive data to a foreign adversary, and the creation of cradle-to-grave consumer profiles on Plaintiffs, and therefore seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and disgorgement of profits obtained by Defendant as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(c)(2), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Marissa Porcuna and Gena Alexander individually and on behalf of the Classes, pray for the following relief:

(a)    An order certifying the BSD Class and the California Class as defined above; appointing Plaintiff Porcuna as class representative of the BSD Class; appointing Plaintiffs as class representatives of the California Class; and appointing Plaintiffs' counsel as Class Counsel;

(b)    A judgment holding that Defendant's actions, as set out above, violate the ECPA, 18 U.S.C. § 2510, et seq., with respect to Plaintiffs and the Classes, and that Defendant's actions violate the California Constitution and intrude upon the seclusion of Plaintiffs and members of the California Class;

(c)    A judgment holding that Defendant's actions, as set out above, violate CIPA, Cal. Penal Code § 631(a), with respect to Plaintiffs and the California Class;

(d)    An injunction requiring Defendant to cease all unlawful activities;

(e)    A judgment awarding statutory damages, disgorgement of profits, punitive damages, costs, and attorneys' fees;

(f)    Such other and further relief that the Court deems reasonable and just.

52

## **JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: February 6,  2026

By: */s/ Brandt Silverkorn*
*One of Plaintiffs' Attorneys*

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the putative Classes*

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:25-CV-07385-WHO