TIA Q. NGUYEN (SBN 338778)
*tia.nguyen@us.dlapiper.com*
**DLA PIPER LLP (US)**
555 Mission Street Suite 2400
San Francisco, California 94105-2933
Telephone: 415.836.2500

BRIAN H. BENJET*
*brian.benjet@us.dlapiper.com*
**DLA PIPER LLP (US)**
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 94105-2933
Telephone: 215.656.3311

RAJ N. SHAH*
*raj.shah@us.dlapiper.com*
ERIC M. ROBERTS*
*eric.roberts@us.dlapiper.com*
ZOE S. LEVINE*
*zoe.levine@us.dlapiper.com*
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: 312.368.2167

*Admitted *pro hac vice*

*Attorneys for Defendant*
XANDR INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARISSA PORCUNA and GENA ALEXANDER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>XANDR INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:25-cv-07385-WHO<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT; MEMORANDUM AND POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: May 20, 2026<br>Time: 2:00 p.m.<br>Room: Courtroom 2 – 17th Floor<br>Judge: Judge William H. Orrick<br><br>Complaint Filed: September 2, 2025<br>Amended Complaint Filed: February 6, 2026 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION................................................................................................1

II.   FACTUAL BACKGROUND ...........................................................................3

    A.    Legislative Background ..........................................................................3

    B.    Xandr's Advertising Exchange ...............................................................5

    C.    Allegations Relating to Temu and the Bulk Data Transfer Rule ...................6

    D.    Plaintiffs' Allegations and Claims ..........................................................7

III.  STATEMENT OF ISSUES TO BE DECIDED.................................................8

IV.   LEGAL STANDARD.......................................................................................8

V.    ARGUMENT ...................................................................................................9

    A.    Plaintiffs' CIPA and ECPA claims should be dismissed. .........................9

        1. Plaintiffs fail to allege that Xandr intercepted any communication, let alone the contents of any communication. ...................................................10

        2.Plaintiffs' conclusory allegations do not adequately allege any interception "in transit." ..........................................................................11

    B.    The website operators' consent defeats Plaintiffs' ECPA claim.................13

        1. Plaintiffs cannot invoke the crime-tort exception because they fail to plead that Xandr's *purpose* was to commit a criminal or tortious act. ..................15

        2.Plaintiffs do not plausibly allege any criminal or tortious act.........................15

    C.    Plaintiffs' common law and constitutional privacy claims should be dismissed. .............18

        1.Plaintiffs fail to allege a reasonable expectation of privacy in a legally protected privacy interest...........................................................................18

        2.Plaintiffs fail to allege any "highly offensive" intrusion...............................21

    D.    The plaintiff-specific allegations fail to plead any individual claim for relief under the *Twombly*/*Iqbal* standard. ...........................................................23

VI.   CONCLUSION...............................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................ 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................................... 8, 23

*Beltran v. Drs. Med. Ctr. of Modesto*,
  2025 WL 1635467 (E.D. Cal. June 9, 2025) ........................................................................ 25

*Brodsky v. Apple Inc.*,
  445 F. Supp. 3d 100 (N.D. Cal. 2020) ................................................................................. 10

*Brown v. Google LLC*,
  525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......................................................................... 20, 21

*Cousin v. Sharp Healthcare*,
  681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........................................................................... 24, 25

*Doe I v. Google LLC*,
  741 F. Supp. 3d 828 (N.D. Cal. 2024) ................................................................... 9, 14, 24, 25

*Doe v. Eating Recovery Ctr. LLC*,
  806 F. Supp. 3d 1109 (N.D. Cal. 2025) ........................................................................ *passim*

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ...................................................................................... 20, 21, 22

*Flanagan v. Flanagan*,
  27 Cal. 4th 766 (2002) ............................................................................................................ 4

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018) .......................................................................... 10, 18

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ..................................................................... 15

*Graham v. Noom, Inc.*,
  533 F. Supp. 3d 823 (N.D. Cal. 2021) ............................................................................ 10, 11

*Griffith v. TikTok, Inc.*,
  2024 WL 5279224 (C.D. Cal. Dec. 24, 2024), *appeal filed*, No. 25-553 (9th
  Cir. Jan. 28, 2025) ................................................................................................................ 13

ii

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................................. 15

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ..................................................................... 18, 20, 22

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024)........................................................... 2, 19, 20, 21

*Ji v. Naver Corp.*,
2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ...................................................................... 19

*Jones v. Peloton Interactive, Inc.*,
720 F. Supp. 3d 940 (S.D. Cal. 2024) .................................................................................. 18

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................................................. 14

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ................................................................................ 20

*King v. Hard Rock Café Int'l (USA), Inc.*,
2025 WL 1635419 (E.D. Cal. June 9, 2025).......................................................................... 11

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002)................................................................................................ 11

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ........................................................................... 14, 15

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ............................................................................ 21

*Low v. LinkedIn Corp.*,
900 F. Supp 2d 1010 (N.D. Cal. 2012) ............................................................................ 18, 22

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021)................................................................................. 11

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016)................................................................................................. 19

*Ove v. Gwinn*,
264 F.3d 817 (9th Cir. 2001)................................................................................................. 8

*People v. Arias*,
45 Cal. 4th 169 (2008) ......................................................................................................... 9

*Rodriguez v. Google LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022) .......................................................................... 11

iii

*Rodriguez v. Ink Am. Int'l Grp. LLC*,
   2025 WL 4034985 (Cal. Super. Ct. Dec. 10, 2025)................................................................. 4

*Saedi v. SPD Swiss Precision Diagnostics GmbH*,
   2025 WL 1141168 (C.D. Cal. Feb. 27, 2025)................................................................. 13, 17

*Saeedy v. Microsoft Corp.*,
   2023 WL 8828852 (W.D. Wash. Dec. 21, 2023)................................................................. 19

*Saleh v. Nike, Inc.*,
   562 F. Supp. 3d 503 (C.D. Cal. 2021)................................................................................. 9

*Smith v. Facebook, Inc.*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017) ......................................................................... 20, 24

*Sussman v. Am. Broad. Cos., Inc.*,
   186 F.3d 1200 (9th Cir. 1999).................................................................................... 14, 15

*Thomas v. Papa Johns Int'l, Inc.*,
   2024 WL 2060140 (S.D. Cal. May 8, 2024).......................................................................... 19

*Tsering v. Meta Platforms, Inc.*,
   2026 WL 89320 (N.D. Cal. Jan. 12, 2026) ......................................................................... 23

*Valenzuela v. Keurig Green Mountain, Inc.*,
   674 F. Supp. 3d 751 (N.D. Cal. 2023) ........................................................................... 11, 12

*In re Yahoo Mail Litig.*,
   7 F. Supp. 3d 1016 (N.D. Cal. 2014) ................................................................................. 13

*In re Zynga Priv. Litig.*,
   750 F.3d 1098 (9th Cir. 2014).......................................................................... 4, 10, 12, 13

**Statutes**

18 U.S.C. § 2510(8) ............................................................................................................. 10

18 U.S.C. § 2511 ................................................................................................................... 9

18 U.S.C. § 2511(2)(d).................................................................................................... 13, 14

Cal. Civ. Code § 1798.100 *et seq.*......................................................................................... 4

Cal. Penal Code § 631(a) ....................................................................................................... 9

**Other Authorities**

28 C.F.R. Part 202............................................................................................................. 3, 6, 15

28 C.F.R. §§ 202.205 ...................................................................................................... 7, 16

iv

28 C.F.R. § 202.206 ............................................................................................................. 16

28 C.F.R. § 202.210 ............................................................................................................. 15

28 C.F.R. § 202.210(a) ........................................................................................................ 16

28 C.F.R. § 202.211 ......................................................................................................... 7, 16

28 C.F.R. §§ 202.211 ........................................................................................................... 17

28 C.F.R. § 202.214 ............................................................................................................... 7

28 C.F.R. § 202.256 ......................................................................................................... 7, 16

28 C.F.R. § 202.301 ......................................................................................................... 7, 16

2026 Reg. Sess. (Cal. Apr. 25, 2025) .................................................................................... 4

Federal Rule of Civil Procedure 8 ......................................................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ......................................................................... 1, 8

Federal Rule 8(a) ................................................................................................................. 23

Justice, *Data Security Program: Implementation and Enforcement Policy through July 8, 2025* (Apr. 11, 2025) ........................................................................................... 7

Sen. Bill No. 690, 2025-2026 Reg. Sess. (Cal. Mar. 24, 2025) ............................................ 4

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 20, 2026 at 2:00 p.m., or as soon thereafter as this matter may be heard in Courtroom 2, 17th Floor, of the United States District Court for the Northern District of California, at the Phillip Burton Federal Building and United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Xandr Inc. will and hereby does move this Court for an order dismissing Plaintiffs' First Amended Class Action Complaint (ECF No. 26) ("FAC") and each claim asserted therein.

The Court should dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs fail both to satisfy Federal Rule of Civil Procedure 8 and to state a claim upon which relief can be granted. This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Request for Judicial Notice, Declaration of Tia Nguyen, and all pleadings, arguments, and matters before the Court.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Marissa Porcuna and Gena Alexander allege they visited the websites diabetesforum.com and healthline.com, respectively, in 2025. They allege Xandr's advertising software secretly collected basic information during those visits, including IP addresses, cookie IDs, device IDs, and unspecified URLs. And they allege (in conclusory fashion) that this collection was highly offensive, violated privacy norms, and was even criminal. They make these allegations even though any such collection was publicly disclosed, as the websites Plaintiffs visited notify users they collect this information and share it with third-parties for advertising purposes. Plaintiffs make these allegations even though California law allows such collection and sharing, which helps businesses large and small publish helpful information without requiring payment. And they make these allegations even though this valuable economic activity is widely understood and expected in the modern internet and advertising industry. As one court in this District has held, "[c]ontemporary internet browsing involves the collection of users' data, including by tracking users across the

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

internet, *and a reasonable user should expect as much.*" *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (emphasis added). Xandr's alleged conduct was not highly offensive, in violation of any reasonable expectation of privacy, or criminal. The First Amended Complaint should be dismissed.

Plaintiffs seek to criminalize the internet's everyday commercial activity through decades-old statutes that never conceived of the internet, let alone the advertising infrastructure that makes so much helpful information available without direct payment from consumers, like Plaintiffs enjoyed here. Indeed, as another court in this District has recognized, "using a third-party company to perform data analytics for web traffic is worlds different from wiretapping and eavesdropping." *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1112, 1119 (N.D. Cal. 2025). By contrast, more recent statutes, such as the California Consumer Privacy Act of 2018 (CCPA), allow websites to collect and share user information as long as the websites provide adequate notices and opt-out mechanisms, like the notices and mechanisms provided by the websites visited by Plaintiffs. Plaintiffs not only twist the older criminal statutes but also disregard recent Department of Justice guidance about enforcing new rules, seeking to impose liability for activity that the Department of Justice has said it would not pursue. Plaintiffs' efforts to distort the law do not withstand scrutiny and should be dismissed for the following reasons.

*First*, Plaintiffs' wiretapping claims under the California Invasion of Privacy Act ("CIPA") and Electronic Communications Privacy Act ("ECPA") fail because the FAC does not plausibly allege Xandr intercepted a communication, let alone its "contents," or that it did so while the communication was "in transit." This is especially true under the rule of lenity, which requires the Court to narrowly construe the scope of the statutes and resolve any ambiguities in favor of Xandr. *See id.* at 1118.

*Second*, the claims under ECPA independently fail because it is a one-party consent statute, and Plaintiffs' allegations show the website operators voluntarily consented to the use of Xandr's technology on their sites. Plaintiffs fail to establish that the crime-tort exception applies to defeat consent because the FAC does not plausibly allege that the purpose of Xandr's alleged collection

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

and/or transmission was criminal or tortious, including under the inapplicable Bulk Sensitive Personal Data Rule ("BSD Rule") codified at 28 C.F.R. Part 202, or any other privacy laws.

*Third*, Plaintiffs' intrusion upon seclusion and invasion of privacy claims must be dismissed because Plaintiffs fail to allege a reasonable expectation of privacy in their internet browsing or that any highly offensive intrusion occurred. Plaintiffs concede the information Xandr allegedly collects is not associated with an individual's identity (*e.g.* a name) but rather a "UUID," meaning a randomly assigned "identifier that appears as a string of numbers" like "7738918429796999062." FAC ¶ 45. Moreover, all of the information Xandr purportedly collected from Plaintiffs falls well within the scope of commonsense industry standards, and Plaintiffs do not plausibly allege Xandr acted in a deceitful or misleading manner that might otherwise elevate its conduct beyond the level of "routine commercial behavior." Quite the contrary—Xandr openly discloses information about its data collection and sharing practices, and the websites Plaintiffs allegedly visited also informed them their information could be shared with third parties for advertising purposes.

*Finally*, each of Plaintiffs' claims fails because the FAC fails to plead facts that any of Plaintiffs' *own* sensitive or personal data was collected, intercepted, or shared by Xandr software. The FAC attempts to substitute a series of conclusory allegations describing, in general terms, how Xandr's technology can *theoretically* be used to disclose personal information obtained through unspecified websites. But Plaintiffs fail to plausibly allege this happened to *them* when they visited public-facing information/forum websites. Thus, the FAC's allegations do not state any actionable claims for relief as to Plaintiffs.

## II.    FACTUAL BACKGROUND[1]

### A.    Legislative Background

The FAC attempts to root its internet-based claims in two inapplicable 1960s laws designed to curb the use of surveillance equipment to spy on confidential oral conversations. In 1967, California enacted CIPA "to criminalize wiretapping and eavesdropping on confidential communications." *Doe*, 806 F. Supp. 3d at 1111. CIPA was intended to "replac[e] prior laws that

---

[1] As required, this Motion treats well-pleaded allegations as true unless contradicted by matters properly before the Court. Xandr reserves the right to dispute the accuracy of each allegation.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

permitted the recording of telephone conversations with the consent of one party to the conversation." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768–69 (2002). In 1968, Congress passed the federal wiretapping act (ECPA) to "regulat[e] only the 'aural acquisition of the contents of any wire or oral communication.'" *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014). Neither of these laws readily "apply . . . to the online world." *See Doe*, 806 F. Supp. 3d at 1119. The "court[] should not contort [itself] to fit the type of conduct alleged in this case into the language of a 1967 criminal statute about wiretapping." *Id.*

The California legislature recently sought to amend CIPA because businesses have confronted a "'wave of abusive and predatory lawsuits'" similar to this one. *Rodriguez v. Ink Am. Int'l Grp. LLC*, 2025 WL 4034985, at *4 (Cal. Super. Ct. Dec. 10, 2025) (quoting comments of Senator Anna Caballero). In 2025, the California Senate passed unanimous amendments clarifying that CIPA's private right of action "does not apply to the processing of personal information for a commercial business purpose." *See* Sen. Bill No. 690, 2025-2026 Reg. Sess. (Cal. Mar. 24, 2025) (as amended) (pending passage by the California Assembly). CIPA was "never intended to apply" to "website analytics or online advertising." SB 690 Analysis, Sen. Comm. on Pub. Safety, 2025-2026 Reg. Sess. (Cal. Apr. 25, 2025).

The California Senate's position is consistent with other recent statutes that already protect privacy rights for those online while allowing websites to collect information about their visitors. One such law is the CCPA, enacted through Proposition 24.[2] *See* Cal. Civ. Code § 1798.100 *et seq.* Far from criminalizing the technologies and conduct alleged in the FAC, the CCPA recognized that "[a]dvertising-supported services" that do not charge consumers "have existed for generations," "can be a great model for consumers and businesses alike," and are "[o]ne of the most successful business models for the internet." *See* Cal. Prop. 24 (2020) § 2(I). Xandr adheres to the CCPA, and Plaintiffs do not allege any violation of the CCPA or other applicable laws.

---

[2] The California "'Legislature passed CCPA to give consumers real control over their data using a modem opt out approach. Suing under CIPA for activity that's already governed by the CCPA goes against legislative intent, creates confusion, punishes compliance, and doesn't make Californians any safer.'" *Ink Am. Int'l Grp.*, 2025 WL 4034985, at *4 (quoting Senator Caballero).

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

**B.      Xandr's Advertising Exchange**

Plaintiffs' claims involve Xandr's online ad exchange, which connects sellers and buyers of online advertising space.[3] FAC ¶¶ 1, 23, 28. Sellers (*e.g.*, a website or mobile app) "embed" Xandr's "software and code" into their "websites and mobile applications" to "monetize advertising space." *Id.* ¶¶ 25, 28, 32–34. When someone visits such a website, the technology alerts buyers that ad space is available. *Id.* ¶ 29. Buyers (*e.g.*, an advertiser) then "participate in real-time advertising auctions" to place the ad. *Id.* ¶ 28. Plaintiffs acknowledge that "Xandr occupies a central and unavoidable position in the modern online advertising ecosystem." *Id.* ¶ 23. As reflected in the FAC, Xandr's technology may improve the experience for website visitors by predicting "users' interests and intent" to show them relevant ads. *Id.* ¶ 24. It also ensures "website operators and mobile application developers" can "make advertising space available for sale" and generate advertising revenue without charging visitors to their websites. *Id.* ¶ 25. Finally, it helps businesses large and small reach likely customers. *Id.* ¶ 23–24.

Plaintiffs seek to paint this wholly ordinary arrangement as nefarious by styling it "hidden commercial surveillance." *Id.* Their own allegations show otherwise. Plaintiffs do not allege Xandr acquires users' personally identifying information, but instead acknowledge Xandr's technology uses "UUIDs"—random and indecipherable "string[s] of numbers," like "77389184297969999062." *Id.* ¶ 45. This renders data pseudonymous ("bearing or using a fictitious name," *see* "pseudonymous," Merriam-Webster Dictionary). *See id.* ¶ 7. If a website embeds Xandr's technology, depending on the website's and visitor's settings, Xandr may obtain information about a visitor's device and browser, an IP address, and "contextual information" such as the URL of a webpage as a normal byproduct of internet browsing. *Id.* ¶ 162. None of this is a user's health condition, religion, occupation, or political views. *See id.* ¶¶ 70–71. Rather, Plaintiffs allege Xandr "enriches" the data by "tracking" random-number UUIDs across websites, "aggregating" information, and purportedly *infers* "behavioral profiles." *Id.* ¶¶ 1, 6–8, 26 n.7, 55–56, 70–72, 75, 80, 98, 143, 160, 166. Like TV advertisers inferring that people who watch NFL games are sports

---

[3] The description of Xandr's services in this section reflect the allegations in the FAC. Xandr anticipates that discovery, if taken in this case, would surface the actual facts about its services.

5

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT

fans, the inferences Xandr's technology provides about website visitors support internet "advertising, analytics, and related commercial purposes." *Id.* ¶ 1.

Plaintiffs also quote and cite numerous public webpages showing that Xandr's technologies are anything but "hidden." *See id.* fns. 2, 8, 9–13, 15–18, 20–21, 24–26, 28–31, 36, 41. Websites and mobile apps that deploy the Xandr technologies make the choice to do so. *Id.* ¶ 35 (alleging websites "incorporate[e] Xandr's tracking infrastructure"); *see also id.* ¶¶ 25, 28, 32, 36, 182, 189.

Additionally, the websites Plaintiffs allegedly visited (diabetesforum.com and healthline.com) both notify visitors they collect data and share it with third parties like Xandr. *See Id.* Exs. A–D. Diabetesforum.com's privacy policy informs users it works together with "service providers" (like Xandr) "and third-party advertising partners collect information about Site visitors" and visitors' data may be disclosed "to any third parties, including advertisers." *Id.* Ex. D. Healthline.com's privacy policy discloses that the website and "other parties may use cookies and similar technologies . . . to collect your data," including through "third-party advertising technologies" (like Xandr) to "deliver relevant and targeted advertisements and other content to you." *Id.* Exs. A & B, *see also* Ex. C. Healthline.com also allows users to manage their consent preferences by allowing or opting out of sharing their data for advertising purposes. *Id.* Exs. A & B; *see also* Ex. C. At no point do Plaintiffs allege that Xandr or the websites misrepresented these data collection practices. And on both websites, Plaintiffs had the opportunity to "opt out" of the use and/or disclosure of their data for targeted advertising purposes. *Id.* Exs. D at 8.c & A–C.

**C.    Allegations Relating to Temu and the Bulk Data Transfer Rule**

One of the FAC's novelties is its attempt to co-opt the U.S. Department of Justice's 2025 final rule on "Preventing Access to U.S. Sensitive Personal Data and Government Related Data by Countries of Concern or Covered Persons," 28 C.F.R. Part 202 (the "Bulk Data Transfer Rule"). FAC ¶¶ 88–117. The Bulk Data Transfer Rule authorized the U.S. Attorney General to prohibit certain transactions with designated countries and persons of concern and to bring enforcement actions. The rule does not authorize private enforcement or empower U.S. citizens to regulate domestic or international commerce. Nonetheless, Plaintiffs seize on the new rule and assert that

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

Xandr has engaged in "prohibited data-brokerage transactions" by transmitting "bulk U.S. sensitive personal data" to a "covered person" as part of a data brokerage transaction. 28 C.F.R. § 202.301.[4] Specifically, they allege Xandr transferred at least 100,000 "covered personal identifiers" (which Plaintiffs allege consist of "advertising identifiers" linked with IP addresses) to an entity they style "Temu," "a Chinese e-commerce platform linked to the Chinese Communist Party." FAC ¶¶ 104–05, 135, 201–02. Plaintiffs contend this was a "prohibited data-brokerage transaction[] with Temu, a foreign owned entity with its principal place of business in China." *Id.* ¶ 194.

However, judicially noticeable records show the Bulk Data Transfer Rule does not apply to the entity Plaintiffs' style "Temu." Public U.S. regulatory filings show that "Temu" is a brand, not a company. Nguyen Decl. Ex. E at 3–4. The FAC omits any formal name for Temu's "U.S. operations." FAC ¶ 88. But public records reflect that Temu's "U.S. operation" is a Delaware-incorporated company called Whaleco Inc. Nguyen Decl. Ex. E at 4. Whaleco is a "U.S. person," 28 C.F.R. § 202.256, subject to U.S. federal and state regulation, as the FAC shows. FAC ¶¶ 88–94. Plaintiffs do not (and cannot) allege that the U.S. Attorney General has designated Whaleco as a "covered person" under the Bulk Data Transfer Rule.

Based on these barebones allegations, Plaintiff Porcuna alleges the Bulk Data Transfer Rule applied to her visit to diabetesforum.com in June 2025. However, the Department of Justice itself said it would not pursue conduct prior to July 2025. U.S. Dep't of Justice, *Data Security Program: Implementation and Enforcement Policy through July 8, 2025* (Apr. 11, 2025).

### D.      Plaintiffs' Allegations and Claims

Porcuna alleges she visited diabetesforum.com, a "forum where users discuss chronic illness, medical treatments, and related concerns," in June 2025. FAC ¶ 129. Alexander alleges that she visited healthline.com, "a widely used health information platform that publishes" health-related articles, in March, September, and October 2025. *Id.* ¶ 139. Plaintiffs allege both diabetesforum.com and healthline.com used Xandr technology when they visited these websites.

---

[4] "Data brokerage" is a commercial transaction involving the transfer of data from a provider to a recipient. 28 C.F.R. § 202.214. "Bulk U.S. sensitive personal data" means certain data types (here, "covered personal identifiers") meeting a "bulk" threshold (here, 100,000). *Id.* §§ 202.205, 202.206. A "covered person" is a *foreign* person or entity meeting certain criteria. *Id.* § 202.211.

*Id.* ¶¶ 130–31, 140–41. Plaintiffs do not specify any particular webpages or URLs they visited, and they do not allege they submitted any personal, health, or other identifying information to these websites. Instead, they allege Xandr captured their pseudonymous UUIDs together with "device identifiers, IP address information," "browser and device metadata," and "full URLs, keywords, and other page-level context." *Id.* ¶¶ 132, 142. Porcuna (but not Alexander) further alleges Xandr "transmitted [her] persistent identifiers" to "Temu." *Id.* ¶ 135.

## III.   STATEMENT OF ISSUES TO BE DECIDED

1.   Do Plaintiffs fail to state their CIPA and ECPA claims, both of which require an intentional interception of the contents of a confidential communication while in transit?

2.   Do Plaintiffs fail to state their ECPA claim for the additional reason that the website operators consented to any alleged capture of the communications at issue?

3.   Do Plaintiffs fail to state their California common law and constitutional privacy claims, both of which require a reasonable expectation of privacy and highly offensive conduct?

4.   Do Plaintiffs fail to plead sufficient facts as to the alleged violation of their own individual rights to sustain any plausible claim for relief?

## IV.   LEGAL STANDARD

A complaint must be dismissed when a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001); *see also Iqbal*, 556 U.S. at 678 (pleading cannot rely on "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement'").

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

## V.      ARGUMENT

### A.      Plaintiffs' CIPA and ECPA claims should be dismissed.

The Court should dismiss the FAC because it takes aim at Xandr simply for participating in a universally experienced and well-known marketplace for internet advertising. Internet advertising allows a vast amount of the internet to be available to users without an admission fee. Businesses post content on the internet—including health and other advice—and generate revenue through advertisements, not by charging visitors. Nonetheless, the FAC is part of a surge of lawsuits seeking to overextend both CIPA and ECPA to routine online data collection based on public browsing activities. These attempts to distort the laws have serious consequences. If CIPA and ECPA are applied to the exclusion of other applicable rules (such as the CCPA), "companies have no way of telling whether their online business activities will subject them to liability." *Doe*, 806 F. Supp. 3d at 1112. "Courts should not contort themselves to fit the type of conduct alleged in this case into the language of a 1967 criminal statute [and 1968 federal statute] about wiretapping." *Id.* at 1118.

To plead a CIPA violation, Plaintiffs must allege that "(1) by means of a machine, instrument, or contrivance, [Xandr] (2) willfully and without the consent of all parties (3) read, attempted to read, or to learn the contents or meaning of any communication, (4) while the communication was in transit (5) to or from any place in California." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 843 (N.D. Cal. 2024) ("*Doe I*") (citing Cal. Penal Code § 631(a)). To plead an ECPA violation, Plaintiffs must allege that Xandr "(1) intentionally (2) intercepted (3) the contents of (4) plaintiffs' electronic communications (5) using a device." *Id.* at 842; *see* 18 U.S.C. § 2511. Courts evaluate these claims together because the elements are similar. *See Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021).

Because CIPA is a criminal statute, it is subject to the "rule of lenity" and should be "narrowly construe[d]." *Doe*, 806 F. Supp. 3d at 1112. Whereas Plaintiffs attempt to seize upon potential ambiguities and expand CIPA's scope to everyday internet browsing, the rule of lenity requires the opposite: courts must interpret ambiguities in CIPA in the manner "favorable to the defendant." *See People v. Arias*, 45 Cal. 4th 169, 177 (2008). This is especially true because "[t]he

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

state of affairs with CIPA is untenable" in light of the "recent" trend towards plaintiffs invoking the statute "to challenge the use of third-party software that records website activity." *Doe*, 806 F. Supp. 3d at 1114. As a result, "[c]ourts are issuing conflicting rulings," demonstrating that "it's virtually impossible to apply [wiretapping statutes] to the online world." *Id.* at 1112, 1119.

Plaintiffs do not adequately plead their CIPA and ECPA claims because the FAC lacks well-pleaded facts that Xandr intercepted any "communication" within the meaning of the statutes, the "contents" of any purported communication, or that any purported communication was "in transit" at the time of the alleged interception.

### 1.    Plaintiffs fail to allege that Xandr intercepted any communication, let alone the contents of any communication.

Plaintiffs do not allege Xandr intercepted a traditional communication, like a phone call or email. They instead focus on the alleged collection of "personal information and browsing data" based on visits to public-facing websites. FAC ¶¶ 130, 140. But website browsing is not the type of person-to-person "communication" that CIPA or ECPA were enacted to protect. *See, e.g.*, *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) (dismissing CIPA claim because "opening a webpage" is "not a communication with content"); *see also Zynga*, 750 F.3d at 1103 (amendments to ECPA focused on "electronic communications services," like "electronic messages, such as email") (citation omitted). Because Plaintiffs fail to identify any "communications" allegedly intercepted by Xandr, their wiretapping claims fail on this basis alone.

Plaintiffs' wiretapping claims also fail because they plead no facts that Xandr intercepted the "contents" of a communication. ECPA defines "contents" of a communication as "information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). "The contents of a communication under CIPA and the [] Wiretap Act are the same." *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) (quotation marks omitted). "The Ninth Circuit has held that 'record information regarding the characteristics of a message that is generated in the course of the communication' does not qualify as 'contents.'" *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 100, 127 (N.D. Cal. 2020) (quoting *Zynga*, 750 F.3d at 1106).

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

Plaintiffs' allegations at most point to non-actionable record information as opposed to the contents of a communication. Although Plaintiffs parrot the elements and assert that Xandr's "code intercepted the contents of [their] interactions with" the diabetesforum.com and healthline.com websites, their list of allegedly intercepted information includes only non-content records: "full URLs, page titles, and a taxonomical classification of the content of the page." FAC ¶¶ 182, 190–91. In *Zynga*, the Ninth Circuit determined that URLs that include only "basic identification and address information" are not "content." *See* 750 F.3d at 1108–09. Plaintiffs also point to the advertising identifiers (UUIDs) Xandr allegedly collects and uses. FAC ¶¶ 53, 135, 142. But these are not "contents," either. *Graham*, 533 F. Supp. 3d at 833. Where, as here, "Plaintiffs do not allege [Xandr] can read the specific information (i.e., content) that a user inputs" and allege only that Xandr "might *infer* a user's traits and habits," the claims fail. *Id.* (emphasis added); *see also King v. Hard Rock Café Int'l (USA), Inc.*, 2025 WL 1635419, at *4 (E.D. Cal. June 9, 2025) (dismissing where the complaint was "devoid of any allegation describing [the] search queries" that might qualify as "the 'contents' of" a communication).

### 2. Plaintiffs' conclusory allegations do not adequately allege any interception "in transit."

Plaintiffs' CIPA and ECPA claims also fail because Xandr did not acquire any communication "in transit." *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002). This element requires plausible allegations that the communication was "acquired during transmission, not while it is in storage." *Id.*; *see also Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1137 (E.D. Cal. 2021) ("[T]he critical question . . . is whether . . . [the defendant] read one of [the] communications while it was still in transit, i.e., before it reached its intended recipient."); *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) ("'While' is the key word here."). "Using the word 'intercept' repeatedly is simply not enough without the addition of specific facts that make it plausible [the defendant] is intercepting their data in transit." *Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022).

As with the other elements of these claims, Plaintiffs' "in transit" allegations are conclusory and boilerplate. Plaintiffs assert a conclusion, without the support of well-pleaded facts, that

11

"Xandr's tracking code . . . executed automatically within [their] browsers during the page load process, contemporaneously with their communications with the website" and that "[t]hese interceptions occurred as part of the browser's rendering sequence." FAC ¶ 182. But as in *Valenzuela*, these allegations "are just too conclusory to survive" because they do "little more than restate the pleading requirement of real time interception." 674 F. Supp. 3d at 758. Plaintiffs must explain "how such code might plausibly work" and provide more "detail as to how the interception occurs" in order to show the alleged interception was contemporaneous. *Id.* at 758.

Moreover, Plaintiffs' own allegations contradict any plausible interpretation that Xandr intercepted any communication *in transit*. In *Torres v. Prudential Fin., Inc.*, the court emphasized that even if a defendant's "software intercepts the contents of Plaintiffs' communications in real time and stores the recording on [the defendant's] server," Plaintiffs must still establish that their communications were accessed "while they are in transit." 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025); *see also Doe*, 806 F. Supp. 3d at 1117 (applying *Torres* and finding that Meta did not intercept communications "in transit" by filtering URL data for storage purposes). Plaintiffs here allege that Xandr's technologies "caus[e] the user's browser to transmit information about the user's session, device, and page activity to Xandr-controlled servers." FAC ¶ 34; *see also id.* ¶ 35 ("Information . . . is duplicated and redirected to Xandr's servers as part of the advertising and auction process."). But there is no allegation that Xandr *accessed* or *reviewed* the communications "in transit." Plaintiffs thus fail to allege that Xandr "used technology to independently interpret the substantive meaning of communications while they were in transit." *Torres*, 2025 WL 1135088, at *5.

Setting aside Plaintiffs' conclusory and contradictory allegations, logic and case law reflect that any alleged collection occurred after Plaintiffs' initial interaction with the websites. Indeed, the Ninth Circuit has explained that when a user enters a URL or interacts with a website, the user's browser (the "client") sends a "GET request" to the website's server, which then responds by delivering the requested content. *See Zynga*, 750 F.3d at 1101–02. In other words, a user's interactions with a website send "requests" to the website servers, which result in the generation of

URLs. Thus, any URLs or other browsing information Xandr collected using the technology embedded on the websites Plaintiffs visited necessarily occurred *after* a website has already received and responded to the user's request. *See id.; see also Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *10 (C.D. Cal. Dec. 24, 2024) (the "sequence" of transmission is determinative for interception claims), *appeal filed*, No. 25-553 (9th Cir. Jan. 28, 2025). As a matter of logic, to the extent that any URLs reflected personal information or search queries (and Plaintiffs do not allege any facts showing that they did), that information had to have been inputted by Plaintiffs onto the website before any URL was generated. Similarly, any collection of information by Xandr would have only occurred after Plaintiffs transmitted information directly to the websites. Thus, Xandr could not have plausibly acquired any information "in transit," and the CIPA and ECPA claims should be dismissed.

**B.       The website operators' consent defeats Plaintiffs' ECPA claim.**

ECPA has a "one-party consent" rule, and there can be no ECPA violation if "one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(d). "[T]he consent of one party is a complete defense to a Wiretap Act claim." *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1026 (N.D. Cal. 2014). "Congress intended the consent requirement to be construed broadly." *Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 1141168, at *12 (C.D. Cal. Feb. 27, 2025). Here, the FAC itself shows that the operators of the websites visited by the Plaintiffs consented to any alleged data collection by choosing to embed the Xandr technology into their websites and apps. The Court should dismiss the ECPA claim.

Plaintiffs' allegations demonstrate that each of the websites they visited were parties to their so-called communications. *See, e.g.*, FAC ¶¶ 182 (alleging Plaintiffs engaged in "communications with the website"); 189 (alleging Xandr captures "the contents of users' interactions *with these* websites") (emphasis added); 191 (alleging Xandr intercepted "the user's communications with the host website"). Plaintiffs further admit that the "website[s] incorporat[e] Xandr's tracking infrastructure," *id.* ¶ 35, meaning that the websites chose to install Xandr's tracking technology. Numerous other allegations in the FAC confirm that the websites consented to the use of Xandr's

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

technology. *See, e.g.*, *id.* ¶¶ 25 ("Xandr integrates directly with publishers."), 28 (explaining that "publishers embed [Xandr's code] into their websites and applications"). It is well-established that a website operator's use of technologies like those alleged in the FAC constitutes, under ECPA, consent from that operator to the data collection at issue. *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (dismissing claim because "Defendant's customers must have chosen to deploy Oracle's tools on their websites, it necessarily follows that 'one of the parties to the communication'—the websites themselves—gave 'prior consent.'"); *Doe I*, 741 F. Supp. 3d at 842 (dismissing ECPA claim because "[t]he alleged interception . . . only occurs because the health care providers choose to install Google source code on their web properties" which "must mean the providers consented to the operation of Google source code"). The website publishers' voluntary use of Xandr technology on their websites is consent and defeats Plaintiffs' ECPA claims. *Katz-Lacabe*, 668 F. Supp. 3d 928 at 945.

Plaintiffs seek to avoid this result (unsuccessfully) by invoking the "crime-tort" exception to the one-party consent rule. *See* FAC ¶¶ 194, 207. Courts apply the crime-tort exception where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1057 (N.D. Cal. 2025) (quoting 18 U.S.C. § 2511(2)(d)). The focus of this exception "is not upon whether the interception itself violated another law; it is upon whether the purpose for the interceptions—its intended use—was criminal or tortious." *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (citation omitted).

Plaintiffs' reliance on the crime-tort exception is unavailing for two reasons. First, they fail to allege well-pleaded facts that Xandr's *purpose* was to engage in a crime or tort, as opposed to the routine and lawful operation of an online ad exchange. Second, they fail to allege any criminal or tortious act under the Bulk Data Transfer Rule or otherwise. Plaintiffs fail to allege that Xandr supplied bulk U.S. sensitive personal data to a covered person in a prohibited data brokerage transaction or that it engaged in any of the privacy torts already addressed. The crime-tort exception does not apply, and the Plaintiffs' ECPA claim should be dismissed.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

### 1. Plaintiffs cannot invoke the crime-tort exception because they fail to plead that Xandr's *purpose* was to commit a criminal or tortious act.

Plaintiffs do not (and cannot) adequately plead ECPA's crime-tort exception to consent because they do not (and cannot) allege that Xandr intercepted their communications intending to commit a crime or tort. Xandr did not, for example, capture Plaintiffs' information to "facilitat[e] some further impropriety, such as blackmail." *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). Rather, Plaintiffs themselves acknowledge that Xandr's *purpose* was to engage in "advertising, analytics, and related commercial purposes." FAC ¶¶ 1, 157, 160. The crime-tort exception does not apply where, as here, the "complaint alleges that the purpose of the interception was not to perpetuate torts on millions of Internet users, but to make money." *Lakes*, 777 F. Supp. at 1058 (internal quotation omitted); *see also In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014) (the exception applies only where the "primary motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously"). Given Plaintiffs' express acknowledgment of Xandr's commercial purpose, they cannot rely on the crime-tort exception to avoid the websites' and mobile apps' consent to using Xandr's technology. For this reason, alone, the Court should dismiss the ECPA claim.

### 2. Plaintiffs do not plausibly allege any criminal or tortious act.

Plaintiffs also do not adequately plead any crime or tort Xandr accomplished through its alleged interception of their communications. First, Plaintiffs fail to allege a plausible violation of the Bulk Data Transfer Rule. FAC ¶¶ 187–209. The Court may consider judicially noticeable facts showing that there is a U.S.-based Temu entity—the alleged "covered person" to which Xandr supposedly transferred data unlawfully—that does not fall within the prohibitions of the Bulk Data Transfer Rule. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1085 (N.D. Cal. 2017) (holding that a court is not required to accept allegations that contradict judicially noticeable facts). Second, Plaintiffs fail to allege any tort or crime under California's common law, constitution, or CIPA, for the reasons set forth in the foregoing and subsequent sections. FAC ¶¶ 177–86.

The Bulk Data Transfer Rule is a new rule that went into effect in April 2025. 28 C.F.R. Part 202. The rule grants interpretive and enforcement authority to the U.S. Attorney General. 28

15

C.F.R. § 202.210. The rule does not grant private Plaintiffs a right of action, nor does it authorize U.S. citizens to exercise oversight and control over domestic or international commerce. In fact, the Department of Justice announced a grace period through July 2025, yet Plaintiffs improperly seek to apply the rule to an alleged transfer from June 2025. FAC ¶¶ 129, 135. Moreover, despite Plaintiffs' belief that the Bulk Data Transfer Rule prevents U.S. companies from engaging in certain transactions with "Temu," the U.S. Attorney General has not explicitly declared any Temu entity (such as the U.S-based Whaleco) a "covered person" under the Bulk Data Transfer Rule. Where the U.S. Attorney General has not seen fit to declare it illegal to do business with Temu's "U.S. operations," FAC ¶ 88, Plaintiffs should not be permitted to supplant their views for the judgment of the U.S. official charged with executing the law.

Regardless, Plaintiffs cannot adequately allege any violation of the Bulk Data Transfer Rule. They purport to rely on section 202.301, which prohibits U.S. persons from "knowingly engag[ing] in a covered data transaction involving data brokerage with a country of concern or covered person." 28 C.F.R. § 202.301. A "covered person" refers to (1) "a *foreign* person," including an entity, owned (directly or indirectly, individually or in the aggregate) 50% or more by a country or person of concern (*e.g.*, China), (2) *foreign* individuals who are employed by or contractors for a country of concern or covered entity, or (3) those explicitly designated as a covered person by the attorney general. 28 C.F.R. § 202.211 (emphasis added). "Covered persons" do not include U.S. persons, which include "any entity organized solely under the laws of the United States or any jurisdiction within the United States." 28 C.F.R. § 202.256. In other words, transactions between two U.S. persons generally cannot violate the Bulk Data Transfer Rule. *See id.*

A covered data transaction is defined as "any transaction that involves any access by a country of concern or covered person to any government-related data or bulk U.S. sensitive personal data." 28 C.F.R. § 202.210(a). Bulk U.S. sensitive data is a set of sensitive personal data relating to U.S. persons meeting the "bulk" thresholds. 28 C.F.R. § 202.206. Plaintiffs allege the sensitive personal data at issue is "covered personal identifiers," FAC ¶ 101, for which the "bulk" threshold is at least 100,000 such identifiers of U.S. persons. 28 C.F.R. §§ 202.205, 202.206.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

Plaintiffs do not plausibly allege that Xandr transferred data to a "covered person," or that the data transferred satisfied the "bulk" requirements. As to the "covered person" requirement, Plaintiffs' belief that Temu is "linked to the Chinese Communist Party," FAC ¶ 135, is not the proper inquiry. Rather, Plaintiffs must plead facts that Xandr transferred U.S. bulk sensitive data to a *foreign* entity meeting certain ownership requirements. They do not. Instead, they expressly plead that Temu has "U.S. operations" and imply that Xandr transmitted data to the "U.S. operations." FAC ¶ 88. Judicially noticeable U.S. regulatory filings show that "Temu" is a brand, not a company. Nguyen Decl. Ex. E at 3–4. Regulatory filings also show that Temu's "U.S. operation" is a Delaware-incorporated company called Whaleco. *Id.* Ex. E at 4. Plaintiffs do not plausibly allege that Xandr transferred data to any Temu entity. Regardless, transferring data to Whaleco, as Plaintiffs imply, would not run afoul of the Bulk Data Transfer Rule. 28 C.F.R. §§ 202.211, 202.256. This, alone, dooms Plaintiffs' attempts to rely on the Bulk Data Transfer Rule.

As to the "bulk U.S. sensitive personal data" requirement, Plaintiffs do not allege facts supporting their "on information and belief" allegation that Xandr transferred at least 100,000 "covered personal identifiers" to "Temu." FAC ¶¶ 104–05, 135, 201–02. Plaintiffs do not, for example, plead what websites a person needed to visit for such a transfer to take place, or any period of time for which this was true. At best, Plaintiffs allege that one individual's data (Porcuna's) was transferred to "Temu" on a single occasion from a single website. *Id.* ¶ 135. These allegations cannot support Plaintiffs' speculation that Xandr transferred 99,999 other U.S. persons' identifiers to the same "Temu" entity. For this reason, too, Plaintiffs' reliance on the Bulk Data Transfer Rule is misplaced.

With regard to Plaintiffs' attempts to invoke the crime-tort exception based on alleged California common law and constitutional privacy torts, this also fails. As set forth in Section V.C below, Plaintiffs fail to plausibly allege any such claims for relief. *See Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 1141168, at *13 (C.D. Cal. Feb. 27, 2025) (dismissing ECPA claims predicated on California privacy violations where "the Court has already found that Plaintiff failed to sufficiently state [those other] claim[s]").

**C.      Plaintiffs' common law and constitutional privacy claims should be dismissed.**

The FAC's allegations fail to clear the "high bar" for pleading either a common law intrusion upon seclusion or constitutional invasion of privacy claim under California law. *Low v. LinkedIn Corp.*, 900 F. Supp 2d 1010, 1025 (N.D. Cal. 2012). To plead "intrusion upon seclusion," Plaintiffs must allege "(1) intrusion into a private place, conversation, or matter to which Plaintiffs have a reasonable expectation of privacy (2) in a manner highly offensive to a reasonable person." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022). To plead a constitutional privacy claim, Plaintiffs must allege "(1) a legally protected privacy interest, (2) a reasonable expectation for privacy, and (3) the intrusion is so serious as to amount to an egregious breach of the social norms." *Id.* Courts consider these claims "together and ask (1) whether there is a reasonable expectation of privacy, and (2) whether the intrusion was highly offensive." *Id.* Plaintiffs fail to plead either a reasonable expectation of, or a highly offensive intrusion into, their privacy.

**1.      Plaintiffs fail to allege a reasonable expectation of privacy in a legally protected privacy interest.**

Whether someone has a reasonable expectation of privacy depends on "the customs, practices, and circumstances surrounding the data collection, including the amount of data collected, the sensitivity of the data collected, the manner of data collection, and the defendant's representations to its customers." *Hammerling*, 615 F. Supp. 3d at 1088. Courts routinely dismiss privacy claims at the pleadings stage where plaintiffs fail to plausibly allege a reasonable expectation of privacy exists. *See, e.g.*, *Gonzales*, 305 F. Supp. 3d at 1092–93 (granting motion to dismiss because Plaintiff "did not have a reasonable expectation of privacy."); *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 950 (S.D. Cal. 2024) (dismissing common law privacy claim, finding "Plaintiff fails to allege a reasonable expectation of privacy in data that she intentionally and voluntarily provided to Peloton."). As in other cases, Plaintiffs have not, as a matter of law, plausibly alleged that Xandr's conduct violated any reasonable expectation of privacy.

First, people do not expect that everyday browsing of public webpages is private just as they do not expect that browsing shelves at a bookstore or flipping through magazines in line at a grocery store is private. Nor would such an expectation be reasonable. "Contemporary internet

18

browsing involves the collection of users' data, including by tracking users across the internet, *and a reasonable user should expect as much*." *Hubbard*, 2024 WL 3302066, at *7. Indeed, "[m]ost of us understand that what we do on the Internet is not completely private" because when "browsing and using . . . public website[s]," a reasonable user should "recognize, if only intuitively, that [the] data has to be going somewhere." *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *2 (S.D. Cal. May 8, 2024) (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 266 (3d Cir. 2016)). To assume otherwise ignores the "inherent nature of the internet." *Id.* Indeed, California law affirmatively allows websites to collect data for the purpose of targeting ads. *See* Cal. Civ. Code. § 1798.100. Data collection is routine and commonplace when users browse public-facing websites, and Plaintiffs' privacy claims are doomed because they do not (and cannot) allege otherwise.

Second, neither the amount nor type of data Xandr allegedly captured gives rise to any reasonable expectation of privacy. Plaintiffs allege (in a conclusory way) that they "maintain a reasonable expectation of privacy in their day-to-day lives—an expectation that extends not only to their internet browsing activity and online communications, but also to the personal data that Xandr surreptitiously collects, enriches, de-anonymizes, and sells without the[ir] knowledge or consent." FAC. ¶ 155. Yet for all of its sweeping claims of "surveillance," the FAC alleges only that Xandr's technology captured Plaintiffs' cookie identifiers, device identifiers, IP addresses, and browser and device metadata, along with the URL of the webpages they viewed. FAC ¶¶ 132, 142. Courts in this circuit hold that these very categories of data do not implicate a protectable privacy interest. *See, e.g.*, *Saeedy v. Microsoft Corp.*, 2023 WL 8828852, at *4 (W.D. Wash. Dec. 21, 2023) (finding "mouse movements, clicks, keystrokes, keywords, URLs of web pages visited, product preferences, interactions on a website, search words typed into a search bar, user/device identifiers, anonymized data, product selections added to a shopping cart, and website browsing activities" are "insufficiently personal"); *Ji v. Naver Corp.*, 2022 WL 4624898, at *7–8 (N.D. Cal. Sept. 30, 2022) (finding "user and device identifiers" are not personal information that can give rise to a privacy

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO

injury); *see also Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025) ("[N]o reasonable expectation of privacy attaches to IP addresses.").

Even then, Plaintiffs do not identify any specific URL- or page-related information Xandr captured, let alone that the information contained anything beyond "basic identification and address information." *Hammerling*, 615 F. Supp. 3d at 1089. Plaintiffs simply assert Xandr collected "page-level context" for public websites, none of which were private or unique to Plaintiffs. These allegations do not clear the "high bar" for Plaintiffs' California privacy claims, in part because "[n]othing about the URLs, or the content of the pages located at those URLs, relates to the past, present, or future physical or mental health or condition *of an individual*." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (emphasis in original).

Third, courts require plaintiffs to clear a much higher bar to plead privacy torts arising from internet browsing, requiring well-pleaded facts that the defendant deceived or lulled the plaintiff into providing access to data. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020); *Hubbard*, 2024 WL 3302066, at *8; *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021). Plaintiffs allege nothing of the sort here. Xandr publicly discloses its data collection practices. FAC fns. 2, 8, 9–13, 15–18, 20–21, 24–26, 28–31, 36, 41. Furthermore, the privacy policies of both diabetesforum.com and healthline.com disclose the use of advertising technologies necessary for Xandr to capture information from visitors to deliver personalized ads. Nguyen Decl. Exs. A–D. Thus, Plaintiffs claims are vastly different from those in other cases where the Court found a reasonable expectation of privacy based on the defendant's alleged misrepresentations or deceptive conduct.

In the *Facebook Internet Tracking* case, "the relevant question [was] whether a user would reasonably expect that Facebook would have access to the user's individual data *after the user logged out of the application*," based on Facebook's affirmative representations that it would not collect such data. 956 F.3d at 602 (emphasis added). In those specific circumstances, the plaintiffs "adequately alleged a reasonable expectation of privacy" based on the "expectation" *set by Facebook* "that logged-out user data would not be collected." *Id.* at 602–03. Facebook breached

20

that promise and engaged in "surreptitious and unseen data collection" of the very data it said it would not collect. *Id.* Likewise, in *Brown*, the court found that "like the plaintiffs in *Facebook* [*Internet*] *Tracking*, Plaintiffs in the instant case could have reasonably assumed that Google would not receive their data while they were in private browsing mode based on Google's representations" in its Privacy Policy and explicit notices on the "Incognito Splash Screen." 525 F. Supp. 3d at 1078. By contrast, the court in *Hubbard* dismissed claims alleging that Google's tracking technologies "allowed[ Google to 'track[] individuals over 80% of the internet'" for the purpose of "generat[ing] advertising revenue." 2024 WL 3302066, at *8. The allegations in *Hubbard* were inadequate to sustain the California privacy claims because Google did "not employ secrecy or deception or some other 'bad act' in connection with data collection." *Id.* at *1–2, 8.

The FAC's allegations mirror those in *Hubbard*. Plaintiffs do not (and cannot) plausibly allege Xandr engaged in any secret or deceptive conduct that violated any reasonable expectation of privacy, or that Xandr made (or breached) affirmative representations that it would not collect their information. Instead, Plaintiffs admit Xandr openly informs users about its data collection practices, and the FAC relies heavily on publicly available webpages explaining those practices in detail. *See* FAC fns. 2, 8, 9–13, 15–18, 20–21, 24–26, 28–31, 36, 41. Thus, Plaintiffs' conclusory and wholesale characterizations of Xandr's practices as "covert" lack factual support and are directly dispelled by the FAC's own allegations. In the face of these disclosures—both Xandr's and the websites'—Plaintiffs cannot plausibly allege they reasonably expected their browsing activity would somehow be exempted from routine commercial collection and use. *See, e.g.*, *Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (no reasonable expectation of privacy where "data policy g[ave] clear notice that third party partners may share data").

In sum, the FAC fails to plead that Plaintiffs had a reasonable expectation of privacy when they browsed public webpages, and their California privacy claims should be dismissed.

### 2. Plaintiffs fail to allege any "highly offensive" intrusion.

Plaintiffs cannot plead that the alleged collection of browsing data or existence of online advertising exchanges constitutes a "highly offensive" intrusion on their privacy. An invasion of

privacy is highly offensive only if it is "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Low*, 900 F. Supp. 2d at 1025. Whether a defendant's actions are "highly offensive to a reasonable person" holistically considers "factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Facebook Tracking*, 956 F.3d at 606. The analysis also "focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.* "Courts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Hammerling*, 615 F. Supp. 3d at 1090 (collecting cases).

*Hammerling* is instructive. There, the plaintiffs alleged that Google "secretly used their Android smartphones to collect data about non-Google app installation metrics, the amount of time spent using non-Google apps, and how often those apps were open" to "determine [the] [p]laintiffs' personal information, such as their religious and political beliefs." *Id.* at 1077. The court dismissed the plaintiffs' California privacy claims for a lack of allegations "that Google's intrusion was highly offensive." *Id.* at 1090. The court first noted that Google's representations about its data collection practices were "not blatantly deceitful," thus making it "a different case than *Facebook* [*Internet*] *Tracking*, where Facebook's surreptitious data collection contravened its affirmative promises to users that it would never track them after they logged out." *Id.* (citing 956 F.3d at 603). The court further reasoned that the plaintiffs "do not allege that the data allegedly collected . . . is sufficiently specific or personal, and its collection sufficiently harmful, to be highly offensive." *Id.*

Here, as in *Hammerling*, the FAC describes routine commercial behavior that cannot rise to the level of a serious invasion of privacy. Plaintiffs allege that "[t]he extent of Xandr's collection, enrichment, and redistribution of highly detailed consumer profiles is staggering and highly offensive." FAC ¶ 171. But they do not allege that Xandr's conduct was "blatantly deceitful." *See* 615 F. Supp. 3d at 1091. Nor can they, as Xandr's technologies and advertising services are publicly disclosed. *See* FAC fns. 2, 8, 9–13, 15–18, 20–21, 24–26, 28–31, 36, 41. Regardless, "Plaintiffs do

22

not allege" facts that Xandr collected information about their private health conditions, and "[t]he lack of details as to how [Xandr] could attain [any] intimate information renders implausible" the allegations of highly offensive conduct. *Id.* at 1091. Similarly, "[a] conclusory claim that [Xandr] collects general information about a user's religion, political affiliation, or sexual preference does not suffice, particularly because Plaintiffs do not plausibly allege the specific apps from which [Xandr] inferred this information." *Id.* Finally, the speculative allegations about the potential to collect data from government workers or vulnerable populations cannot sustain *Plaintiffs'* claims where they do not allege they fall into these groups. *See* FAC ¶¶ 132, 142; *infra* Section V.D.

In short, courts "require[] that plaintiffs bringing [] privacy claims arising from the collection and disclosure of personal data sufficiently allege that [the] Defendant[] did more than engage in such routine behavior—*i.e.*, that they engaged in secret or deceptive data collection." *Tsering v. Meta Platforms, Inc.*, 2026 WL 89320, at *7 (N.D. Cal. Jan. 12, 2026) (dismissing claims alleging Meta's software collected personal data for advertising purposes) (internal quotation marks omitted). The FAC does not allege that Xandr secretly or deceptively captured Plaintiffs' data, and it falls short of alleging the requisite "highly offensive" invasion of Plaintiffs' privacy. The Court should dismiss the California common law and constitutional privacy claims for this reason, too.

### D.   The plaintiff-specific allegations fail to plead any individual claim for relief under the *Twombly/Iqbal* standard.

Beyond the deficiencies above, each claim also fails because the allegations describing Xandr's practices *as a general matter* do not adequately plead that Xandr violated *Plaintiffs'* personal rights. Plaintiffs do not allege, for example, the content of their own communications that Xandr supposedly intercepted, or what information, if any, Xandr collected specific to them that would give rise to a privacy violation. The FAC simply relies on boilerplate allegations that they each visited a publicly available website without logging in or supplying their own personal health information. FAC ¶¶ 129, 139. Absent Plaintiff-specific facts that their *own* private information was unlawfully collected or transmitted, they cannot maintain any plausible claim for relief.

Under Federal Rule 8(a), Plaintiffs must plead facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Plaintiffs must plead more than a general or

23

overarching theory that Xandr can collect "personal and sensitive . . . information on [a] website and that this information was then improperly shared." *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1123 (S.D. Cal. 2023). They also must "factually explain their personal participation" in the alleged activity. *Id.* Courts dismiss complaints that (like the FAC) advance speculative theories of widespread data collection without facts regarding the information *actually* collected and transmitted and how such practices give rise to any tangible privacy violations. *E.g.*, *id.* (dismissing all claims because the plaintiffs provide "no meaningful factual support as to what activities each Plaintiff engaged in on Sharp's website and what information each Plaintiff provided"); *Doe I*, 741 F. Supp. 3d at 836 (dismissing all claims because "the allegations in the complaint are too vague to support an inference that the [website] providers have . . . caused Google to receive the plaintiffs' personal health information"). Applying the reasoning in both *Cousin* and *Doe I*, Plaintiffs' FAC should be dismissed in its entirety because Plaintiffs fail to plausibly connect their generalized allegations regarding Xandr to their own personal experiences.

The FAC bears many similarities to the dismissed *Cousin* complaint. Plaintiffs assert an "overarching theory" that Xandr disclosed potentially sensitive personal information without their consent through the "embedding of" a technology for tracking internet browsing behavior. *Id.* at 1121, 1123. They allegedly visited "general health information" websites "accessible to the public at large." *Id.* However, their use of these websites does not constitute "information relate[d] specifically to Plaintiffs' health." *Id.* (quoting *Smith*, 262 F. Supp. 3d at 955. In other words, "Plaintiffs cannot maintain their claims based upon the theory that [Xandr's] sharing of their browsing activity, collected on [a] publicly facing website, is a disclosure of their sensitive medical information." *Id.* at 1124. Other than isolated visits to two websites, Plaintiffs merely "lump together a variety of alleged activity undertaken by" Xandr. *Id.* at 1123. Generalized speculation about what might occur on the internet does not supply "meaningful factual support as to what activities each Plaintiff engaged in" or "what information each Plaintiff provided" to Xandr. *Id.*

The Court dismissed a complaint similar to the *Cousin* complaint in *Doe I*, 741 F. Supp. 3d at 828. There, the plaintiffs asserted that Google violated their privacy rights by allowing websites

24

to "use Google source code to analyze traffic on their web properties" and disclose "personal health information" that was fed into Google's "advertising machinery." *Id.* at 836. The plaintiffs' "abstract," "indefinite," and "hypothetical" allegations regarding the prevalence of Google's source code on the internet became "largely meaningless (to the point of seeming intentionally slippery) once you sift through the fine print of the plaintiffs' [lengthy] complaint." *Id.* at 839. Upon examination, the plaintiffs used imprecise language to describe "the type of information that is allegedly transmitted" and failed to "explain how they determined that *their* private health information" was intercepted. *Id.* at 838–39 (emphasis added). The court ultimately was unable to separate the complaint's hypothetical examples and speculation from "true factual allegations." *Id.*

Plaintiffs' FAC suffers from the same deficiencies that required dismissal of the complaints in *Cousin* and *Doe I*. Aside from Porcuna's singular allegation that she visited diabetesforum.com and Alexander's singular allegation that she visited healthline.com, the FAC is devoid of well-pleaded facts regarding the *plaintiff-specific* information Xandr purportedly captured and shared with third-parties. "Plaintiffs do not specifically allege that their searches related to the provision of healthcare, patient status, or otherwise included PHI." *Beltran v. Drs. Med. Ctr. of Modesto*, 2025 WL 1635467, at *7 (E.D. Cal. June 9, 2025) (dismissing privacy claims). Instead, Plaintiffs broadly contend, without supporting facts, that Xandr's capture of a public webpage's URL somehow allowed it to "monetize[]" Plaintiffs' "health-related" information as part of a "profile" it created for them. FAC ¶¶ 131, 141. Plaintiffs' speculative and hypothetical allegations about the broader operation of the internet do not implicate their own privacy interests or satisfy the *Iqbal*/*Twombly* plausibility standard. *Cousin*, 681 F. Supp. 3d at 1123; *Doe I*, 741 F. Supp. 3d at 838. The Court should dismiss the FAC for the same reasons as in *Cousin* and *Doe I*.

## VI.   CONCLUSION

For the foregoing reasons, Xandr respectfully requests that the Court dismiss Plaintiffs' FAC, and every cause of action stated therein, in its entirety.

Dated: March 13, 2026                              Respectfully submitted,

                                                   **DLA PIPER LLP (US)**


                                                   By:    */s/ Tia Q. Nguyen*
                                                          TIA Q. NGUYEN (SBN 338778)
                                                          *tia.nguyen@us.dlapiper.com*
                                                          **DLA PIPER LLP (US)**
                                                          555 Mission Street Suite 2400
                                                          San Francisco, California 94105-2933
                                                          Telephone: 415.836.2500

                                                          *Attorneys for Defendant*

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-07385-WHO