BRANDT SILVERKORN (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Attorney for Plaintiffs*
MARISSA PORCUNA and GENA ALEXANDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARISSA PORCUNA and GENA ALEXANDER, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>vs.<br><br>XANDR, INC., a Delaware corporation,<br><br>*Defendant.* | Case No. 3:25-cv-07385-WHO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date: May 20, 2026<br>Time: 2:00 p.m.<br>Room: Courtroom 2 – 17th Floor<br>Judge: Judge William H. Orrick<br><br>Complaint Filed: September 2, 2025<br>Amended Complaint Filed: February 6, 2026 |

**TABLE OF CONTENTS**


**I. INTRODUCTION** .... 1

**II. BACKGROUND** .... 3

**III. ARGUMENT** .... 6

**A. Plaintiffs Adequately Allege Xandr Intercepted the Contents of Communications While in Transit.** .... 6

**1. Xandr intercepted URLs revealing sensitive health information, which qualify as contents of communications.** .... 6

**2. Xandr's interception took place when the communications were in transit.** .... 8

**B. Plaintiffs' Invocation of the Crime-Tort Exception Defeats the ECPA's One-Party Consent Defense.** .... 11

**1. Plaintiffs do not allege the website operators consented to the full scope of Xandr's interceptions.** .... 11

**2. The crime-tort exception invalidates any consent.** .... 12

**C. Plaintiffs Sufficiently Allege an Invasion of Privacy Under the California Constitution and Intrusion Upon Seclusion.** .... 16

**1. Plaintiffs have a reasonable expectation of privacy in the comprehensive data Xandr collects and enriches to create detailed dossiers.** .... 16

**2. Xandr's massive surveillance operation is highly offensive to a reasonable person.** .... 21

**D. Xandr's Catch-All Arguments Do Not Support Dismissal.** .... 23

**IV. CONCLUSION** .... 24

# TABLE OF AUTHORITIES

## U.S. COURT OF APPEALS CASES

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ........ *passim*

*In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014) ........ 7

*Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022) ........ 6

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........ 14

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) ........ 8

## U.S. DISTRICT COURT CASES

*Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 11, 12

*Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836 (N.D. Cal. 2014) ........ 9

*Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........ 24

*Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967 (S.D. Cal. 2023) ........ 7, 24

*Deivaprakash v. Conde Nast Digital*, 798 F. Supp. 3d 1100 (N.D. Cal. 2025) ........ 6

*Doe I v. Google LLC*, 741 F. Supp. 3d 828 (N.D. Cal. 2024) ........ 24

*Doe v. Eating Recovery Ctr. LLC*, 23-cv-05561, 2024 WL 2852210 (N.D. Cal. June 4, 2024) ........ 10

*Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025) ........ 10

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ....................................................20, 21, 22, 24

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ..........................................................................8, 11

*Doe v. Regents of Univ. of California*,
672 F. Supp. 3d 813 (N.D. Cal. 2023) ..................................................................................23

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025).........................................................................10, 12

*Fregosa v. Mashable, Inc.*,
25-cv-01094, 2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .............................................6

*Gabrielli v. Haleon US Inc.*,
25-cv-02555, 2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .........................................22

*Gabrielli v. Motorola Mobility LLC*,
No. 24-cv-09533, 2025 WL 1939957 (N.D. Cal. July 14, 2025)...................................17

*Gilligan v. Experian Data Corp.*,
No. 25-cv-02873, 2026 WL 32259 (N.D. Cal. Jan. 6, 2026) ..................................*passim*

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ....................................................................................8

*Griffith v. TikTok, Inc.*,
23-cv-00964, 2024 WL 5279224 (C.D. Cal. Dec. 24, 2024) ..........................................10

*Hammerling v. Google LLC*,
No. 21-cv-09004, 2022 WL 17365255 (N.D. Cal. Dec. 1, 2022)..................................21

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021) ..................................................................................21

*Hazel v. Prudential Fin., Inc.*,
22-cv-07465, 2023 WL 3933073 (N.D. Cal. June 9, 2023)...........................................10

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024)......................................................................................9

*In re Allstate & Arity Consumer Privacy Litig.*,
25 CV 407, 2026 WL 594708 (N.D. Ill. Mar. 3, 2026) .................................................24

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ..................................................................................21

*In re Google Inc.*,
No. 13-MD-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013)..................................6

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) ...............................................................7

*Jones v. Peloton Interactive, Inc.*,
720 F. Supp. 3d 940 (S.D. Cal. 2024) .......................................................................20

*Katz-Lacabe v. Oracle Am., Inc.*,
No. 22-cv-04792, 668 F. Supp. 3d 928 (N.D. Cal. Apr. 6, 2023)................11, 16, 18, 22

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ....................................................................20

*King v. Hard Rock Cafe Int'l (USA), Inc.*,
No. 24-cv-01119, 2025 WL 1635419 (E.D. Cal. June 9, 2025) .......................................8

*Krzyzek v. OpenX Techs., Inc.*,
No. 25-cv-05588, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026) ..............................*passim*

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) .......................................................................22

*Pemberton v. Rest. Brands Int'l, Inc.*,
25-cv-03647, 2025 WL 3268404 (N.D. Cal. Nov. 24, 2025) .........................................19

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
214 F. Supp. 3d 808 (N.D. Cal. 2016) .......................................................................12

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
402 F. Supp. 3d 615 (N.D. Cal. 2019) ................................................................12, 15

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024).....................................................................7, 12

*R.S. v. Prime Healthcare Services, Inc.*,
24-cv-00330, 2025 WL 103488 (C.D. Cal. Jan. 13, 2025) .............................................15

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ...........................................................*passim*

*Selby v. Sovrn Holdings, Inc.*,
No. 25-cv-03139, 2025 WL 2950164 (N.D. Cal. Oct. 17, 2025)....................................18

*Semien v. PubMatic Inc.*,
25-cv-03164, 2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ..................................... *passim*

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ..................................... 20

*Thomas v. Papa Johns Int'l, Inc.*,
22-cv-2012, 2024 WL 2060140 (S.D. Cal. May 8, 2024) ..................................... 20

*Torres v. Prudential Fin., Inc.*,
22-cv-07465, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) ..................................... 10

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) ..................................... 10

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) ..................................... 9

**CALIFORNIA SUPREME COURT CASES**

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ..................................... 17, 21

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ..................................... 22

*White v. Davis*,
13 Cal. 3d 757 (1975) ..................................... 2

**STATUTES**

18 U.S.C. § 2510 ..................................... 2

18 U.S.C. § 2510(8) ..................................... 7

18 U.S.C. § 2511(1)(a) ..................................... 6

18 U.S.C. § 2511(d) ..................................... 12

28 C.F.R. § 202 ..................................... 13

28 C.F.R. § 202.208 ..................................... 14

28 C.F.R. § 202.211(a) ..................................... 15

28 C.F.R. § 202.211(b)(8) ..................................... 15

28 C.F.R. § 202.601 ..................................... 14

28 C.F.R. § 202.601(a)(1) ..................................... 13

Cal. Penal Code § 630 ..................................... 2

Cal. Penal Code § 631(a) ..................................... 2, 6

**OTHER AUTHORITIES**

*Attorney General Miyares Demands Answers About Online Retailer Temu's Business Practices and Chinese Communist Party Connections*, Office of the Attorney General of VA (last visited Apr. 10, 2026) .......... 14

Cal. State Assem., Assem. Comm. on Public Safety, SB 690 (2025) .......... 2

*Data Security Program: Implementation and Enforcement Policy Through July 8, 2025*, U.S. Department of Justice (Apr. 11, 2025) .......... 15

Diane Rinaldo, *Looking Beyond TikTok: The Risks of Temu*, Center for Strategic & International Studies (Oct. 24, 2024) .......... 14

Hilal Aka, *The FTC's Amazon-Temu Blunder: Working With China to Target American Tech*, Aegis Insights (Jan. 31, 2025) .......... 14

## I. INTRODUCTION

Before Plaintiffs Marissa Porcuna and Gena Alexander navigated to different websites to research health and medical issues of interest to them, they did not know who Defendant Xandr, Inc. ("Xandr") was, but Xandr almost certainly knew about them. Xandr operates as a massive data broker that tracks consumers' behavior across the internet without their knowledge to build "cradle-to-grave" profiles. It surreptitiously collects, enriches, and distributes personal information about tens of millions of consumers through the operation of its advertising platform. To do so, Xandr collects data from a variety of sources. For instance, Xandr contracts with website operators to embed its code in given webpages, like those visited by Plaintiffs, and through this code Xandr collects persistent device and cookie identifiers, IP addresses, location, browser and device metadata, and the full URLs of the specific pages a user is viewing—including the subject matter of health forum posts and medical information articles being accessed at that exact moment. (Dkt. 26, First Amended Class Action Complaint ("FAC") ¶¶ 36–38, 132, 142, 162.) These persistent identifiers allow Xandr to track Plaintiffs' Internet browsing across websites, helping it to build a fuller picture of Plaintiffs' lives, including their activities, hobbies, interests, likes, and dislikes. Xandr then enriches this data with behavioral and biographical data from more than 190 third-party sources, which allow Xandr to re-identify users even after they have switched devices or cleared their cookies. (*Id.* ¶¶ 55–66.) Xandr also sharpens these profiles with the addition of *first-party* data from Microsoft's ubiquitous suite of products. (*Id.* ¶¶ 58–59.)

The precision of this combined data set is remarkable. Xandr used it to create at least 650,000 categories of "audience segments" that advertisers can target, including based on health conditions, political views, sexual orientation, and economic vulnerability. (*Id.* ¶ 123.) When a user visits a webpage with Xandr's code embedded, Xandr learns in real time who the user is and what page they are navigating, and then shares that information with those connected to its platform. (*Id.* ¶ 37.) Nor is this data available exclusively to advertisers: Xandr broadcasts it to a wide array of companies, such as data brokers, that can retain and repurpose it, a system Congress has warned enables the creation of dossiers that expose consumers to blackmail and foreign-intelligence risks. (FAC ¶¶ 9, 80–87.)

None of this is what Plaintiffs, or other ordinary individuals, expect when they browse the Internet. (*See id.* ¶ 10.) It is also antithetical to the values espoused by California law. In fact, this State's voters added a right to privacy to the state constitution primarily due to their "focused privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." *White v. Davis*, 13 Cal. 3d 757, 774 (1975). That new provision supplemented work the legislature had undertaken in the late 1960s, when it passed the California Invasion of Privacy Act. In passing that law, the legislature "declare[d] that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. As a recent Assembly committee analysis observed, "[t]his policy statement . . . appears to contemplate CIPA's application to a continuing evolution of science and technology." (Cal. State Assem., Assem. Comm. on Public Safety, SB 690, at 8 (2025)).[1]

In this lawsuit, Plaintiffs contend this covert capturing and commercial exploitation of sensitive information about them violates CIPA, Cal. Penal Code § 631(a); violates the state constitution; constitutes intrusion upon seclusion; and violates the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq*. Xandr's motion attempts to mask its operation as nothing more than routine advertising on the Internet. (Dkt. 28, Defendant's Notice of Motion and Motion to Dismiss Plaintiffs' FAC ("MTD") at 1–2.) This effort to downplay the scale and reach of its operations is a transparent attempt to sidestep the myriad cases that have found this type of nonconsensual and "cradle-to-grave" data aggregation and sharing

---

[1] Xandr highlights SB 690's passage in the State Senate. The bill failed in the Assembly. One observation in the committee report for the Assembly's Public Safety Committee was that the bill's language "may have less to do with protecting smaller companies from vexatious litigation and more about insulating tech giants that track user information." (Cal. State Assem., Assem. Comm. on Public Safety, SB 690, at 13 (2025)).

actionable. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 603–04 (9th Cir. 2020); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075 (N.D. Cal. 2025).

Xandr asserts that Plaintiffs have failed to allege any actionable communications were intercepted in transit, and that the website operators consented to any such interception. This looks past the FAC's detailed allegations that explain how Xandr's embedded code works, contemporaneously collecting and acting on key information about Plaintiffs and their visits. Xandr also ignores that any consent—an element that Xandr carries the burden to demonstrate—is invalidated because Xandr collected the information it did to commit further tortious acts. Xandr next argues that Plaintiffs' privacy tort claims insufficiently allege a reasonable expectation of privacy, or that Xandr's actions are highly offensive. But again, this is not the routine advertising case Xandr paints it as. Plaintiffs allege a far more invasive practice: Xandr tracks users throughout their interactions across the internet, then uses that data to build up ever-more-detailed profiles, which Xandr exploits for its own benefit and without users' consent. Finally, Xandr's catch-all arguments that Plaintiffs fail to satisfy Rule 8's pleading requirements fall flat. Plaintiffs have pled sufficient facts to withstand dismissal.

For these reasons and as explained below, Xandr's motion should be denied in its entirety.

## II. BACKGROUND

Xandr operates a digital advertising platform that conducts automated, real-time auctions where advertisers bid on the chance to display advertising content to users. (FAC ¶ 3.) To drive this system and allow publishers to deliver ever-more-precise advertising, Xandr relies on its status as a massive data broker and the comprehensive, individualized profiles it maintains on consumers. (*Id.* ¶ 1.) To build these profiles, Xandr develops and maintains code that surreptitiously operates in the background of websites across the internet. (*Id.* ¶ 3.) The data Xandr captures on each page load is not limited to generic signaling information. It includes the persistent identifiers for the user—cookie IDs, device IDs, and mobile advertising IDs that function as unique personal markers—along with the user's IP address, location, browser and device metadata, and the full URL of the specific page being viewed at the moment of capture. (*Id.* ¶¶ 36, 132, 142, 162.) That full-string URL includes not only the overall domain of the website,

but more precise data. (*Id.* ¶¶ 133, 142, 143.) For example, in a health forum or medical information platform, it is a precise record of the specific condition, treatment, or support resource the user was accessing at that exact moment. (*Id.* ¶¶ 36–38, 182–84.) Xandr also captures a real-time taxonomical classification of the page's content. (*Id.* ¶ 182.)

Xandr does not treat each page visit as an isolated event. It links every interaction to a persistent identifier that allows it to recognize and track the same user even if cookies are deleted or the user changes devices. (*Id.* ¶¶ 43–46.) Xandr aggregates behavioral signals from across the thousands of websites on which its code is embedded into a continuously updated profile tied to that identifier. (*Id.* ¶¶ 55–56.) From there, Xandr integrates that data with that of first and third parties, including Microsoft and its cross-device partner Tapad—a company owned by Experian that maintains over 4.2 billion digital identifiers covering approximately 250 million U.S. individuals. (*Id.* ¶¶ 57–62.) It also maintains active identity-syncing partnerships with approximately 190 third-party data brokers and identity vendors, including LiveRamp, Oracle Data Cloud, and Epsilon, which supply offline transaction records, hashed email addresses, and other data that allows Xandr to connect its UUID-linked profiles to real-world individuals. (*Id.* ¶¶ 64–66.) Xandr calls these identifiers and profiles "pseudonymous." But that characterization is a fiction: a profile anchored to a persistent identifier that tracks a person across time, devices, and contexts—and that is continuously enriched with data tied to real-world identity—is not meaningfully anonymous. (*Id.* ¶¶ 47–53.)

This allows Xandr to identify precise groups of consumers. One database on Xandr's website revealed more than 650,000 distinct audience segments available for targeting. (*Id.* ¶ 71.) These segments reflect more than just demographic inferences, and include deeply sensitive personal characteristics: "Her2 Positive – Breast Cancer," "Incest/Abuse Support," "Gambling Addiction," and "Occupation > Disabled," among hundreds of thousands of others. (*Id.*) Xandr assigns users to these segments based on their browsing behavior and then makes those assignments available to the hundreds of buyers participating in advertising auctions. (*Id.* ¶¶ 70–72, 80.)

As a website loads with Xandr's technology enabled, Xandr contemporaneously assembles

a bid request—a data packet containing the user's persistent identifiers, location, IP address, device information, the full URL of the page being viewed, and the behavioral segment data associated with that user's profile—and broadcasts it to dozens or hundreds of third-party buyers participating in the advertising auction. (*Id.* ¶¶ 37–38, 80.) Those buyers receive detailed information about who the user is, the URL they're on, and what sensitive characteristics Xandr or other segment providers have inferred about them—whether or not they win the auction, and regardless of whether they have any direct relationship with the user. (*Id.* ¶ 8.) As part of its system, Xandr maintains an active identity-synchronization integration with Temu, a Chinese e-commerce platform owned by PDD Holdings and operating under the jurisdiction of the People's Republic of China. (*Id.* ¶¶ 88, 94–96.) Through that integration, Xandr's code causes users' browsers to transmit data to Temu's servers that include persistent identifiers—including UUIDs, IP addresses, and cookie data—allowing Temu to recognize and track those individuals across Xandr's advertising ecosystem and across unrelated websites, even where the user has never visited or interacted with Temu. (*Id.* ¶¶ 95–98.) The BSD Rule, which took effect April 8, 2025, prohibits this conduct. (*Id.* ¶¶ 100–05.)

Plaintiffs each navigated to specific healthcare websites. Plaintiff Porcuna visited diabetesforum.com, a health-focused forum where users discuss chronic illness, medical treatments, and related concerns, and where she browsed articles on the condition. (*Id.* ¶ 129.) Plaintiff Alexander visited healthline.com, a health information platform that publishes articles concerning medical conditions, treatments, symptoms, and health-related guidance. (*Id.* ¶ 139.) In both cases, Xandr's code was embedded on the website, where it captured information that included cookie identifiers, device identifiers, IP address information, and browser and device metadata, together with the full URLs, keywords, and other page-level context. (*Id.* ¶¶ 130–32, 140–42.) Xandr then enriched that information with additional data that included Plaintiffs' inferred interests, health concerns, and vulnerabilities beyond what was apparent from the detailed URL alone to create bid requests relayed to auction participants. (*Id.* ¶¶ 133, 143.) Plaintiffs contend this type of surreptitious, unconsented-to data scraping of comprehensive profiles violates the ECPA, CIPA, and California privacy law.

# III. ARGUMENT

## A. Plaintiffs Adequately Allege Xandr Intercepted the Contents of Communications While in Transit.

Xandr first attacks Plaintiffs' ECPA and CIPA claims. CIPA section 631 creates four potential avenues to liability, but only two are at issue here: (1) willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading, or attempting to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state, and (2) using, or attempting to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained. Cal. Penal Code § 631(a).[2] ECPA similarly creates a claim for relief against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication[.]" 18 U.S.C. § 2511(1)(a). Both require Plaintiffs to assert that the contents of their communications were intercepted, and that the interception took place while the communications were in transit. *See Krzyzek v. OpenX Techs., Inc.*, No. 25-cv-05588, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026). Plaintiffs have done so here.

### 1. Xandr intercepted URLs revealing sensitive health information, which qualify as contents of communications.

Xandr claims Plaintiffs' communications include only "non-actionable record information."[3] (MTD at 11.) The definition of "contents"—"information concerning the substance,

---

[2] Xandr suggests the rule of lenity constrains CIPA's interpretation here. Courts have repeatedly rejected that "grievous ambiguity or uncertainty" exists within CIPA to apply this canon. *Riganian*, 791 F. Supp. 3d at 1094 (finding "no role for that rule"); *Fregosa v. Mashable, Inc.*, 25-cv-01094, 2025 WL 2886399, at *9 (N.D. Cal. Oct. 9, 2025) (similar); *Deivaprakash v. Conde Nast Digital*, 798 F. Supp. 3d 1100, 1108 (N.D. Cal. 2025) (similar).

[3] Xandr suggests "communications" under the CIPA and ECPA does not include the web browsing at issue here. (MTD at 10.) This is foreclosed by Ninth Circuit precedent. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) (recognizing CIPA Section 631(a) "applies to Internet communications"); *In re Google Inc.*, No. 13-MD-02430, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (endorsing reading of CIPA to apply to new technologies). Likewise, courts recognize that the ECPA applies in the context of a consumer's web browsing. *See Krzyzek*, 2026 WL 206855, at *6.

purport, or meaning of [a] communication[,]" 18 U.S.C. § 2510(8)—stretches far more broadly than Xandr would have. *See also Krzyzek*, 2026 WL 206855, at n.17 (recognizing the term "contents" is treated identically under CIPA and ECPA). The Ninth Circuit addressed the definition of "contents" in the context of website browsing in *In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014). *Zynga* held that the ECPA differentiates between "record information," or "information regarding the characteristics of the message" such as where the message originated, or when the message was sent, and "content," which is information reflecting the "substance" or "meaning" of the communication. *Id.* at 1106.

As applied to URLs, URLs containing only "basic identification and address information" fall outside the definition of contents, but URLs that reveal the substance of a user's communication do qualify as contents. *Id.* at 1108–09. Courts have subsequently agreed that full-string URLs that reveal search terms or the articles an individual views are "content" under this framework. *See Gilligan v. Experian Data Corp.*, No. 25-cv-02873, 2026 WL 32259, at *3 (N.D. Cal. Jan. 6, 2026) (recognizing full-string URLs intercepted by a third-party data broker constituted content); *Krzyzek*, 2026 WL 206855, at *6 ("URLs can also reveal website users' personal interests, queries, and habits, particularly when aggregated into comprehensive user profiles."); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) ("URLs which disclose search terms that reveal website users' 'personal interests, queries, and habits' are 'contents' of communications under CIPA and ECPA."). This is especially true with respect to URLs that reveal health-related information, as this Court recognized in *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793, 796 (N.D. Cal. 2022). The Court held that health-site URLs including path and query information "concern the substance of a communication" because they reveal the user's "past, present, or future physical or mental health or condition." *Id.* (internal quotations omitted); *see also R.C.*, 733 F. Supp. 3d at 887, 902 (allowing ECPA claim when "contents" were alleged to be visit to pharmacy website that reflected purchase of diabetes testing kit, which would allow website owner to infer consumer or family member had diabetes); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023) (recognizing URLs that reveal specialty healthcare providers or treatments for medical conditions plausibly conveyed content).

Under these cases, Plaintiffs have plausibly alleged that Xandr intercepted the contents of their communications, including the full URLs of the specific pages they were viewing on diabetesforum.com and healthline.com—a diabetes support community and a health information platform—including path and query information that reveals the precise medical topics and support content they were accessing at the moment of interception. (FAC ¶¶ 36–38, 132, 142, 182–84.) Rather than revealing only the characteristics of the communications, the full URLs from diabetesforum.com or healthline.com tell Xandr what specific condition, treatment, and support resource each Plaintiff was researching. (*Id.* ¶¶ 36–38, 129, 132, 139, 142.) Indeed, the information Xandr recorded and aggregated was so detailed as to allow it to categorize the consumer into one of more than 650,000 categories for future advertising. (*Id.* ¶ 123.)

Xandr's cited authorities are inapposite because they all involve sharing generic website data that falls on the opposite side of the *Zynga* spectrum. For example, in *Graham v. Noom, Inc.*, the plaintiffs conceded that much of the information they alleged was captured was *not* content, and the court did not address what would be considered content. 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021). And the plaintiffs in *King v. Hard Rock Cafe Int'l (USA), Inc.* failed to tie their allegations that they visited a hotel website to any claim that those URLs were descriptive or contained anything more than record information. No. 24-cv-01119, 2025 WL 1635419, at *4 (E.D. Cal. June 9, 2025). There was nothing in those cases alleging that the full-string URLs revealed sensitive health information, such as a diabetes diagnosis. At this stage, Plaintiffs have plausibly alleged how the URLs of the pages they visited are "content" for purposes of the ECPA and CIPA. *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1077 (N.D. Cal. 2023) ("[P]laintiffs have adequately alleged covered content is transferred. The boundaries of what transferred information is content under the Act is better determined on a full evidentiary record.").

**2. Xandr's interception took place when the communications were in transit.**

Next, Xandr argues that Plaintiffs' ECPA and CIPA claims are missing allegations that the communications were intercepted "in transit." Both statutes require that a communication be intercepted "while in transit"—that is, while it is being transmitted, rather than after it has come to rest in storage. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002). Xandr

contends that Plaintiffs' in-transit allegations are conclusory, and that any collection necessarily occurred after their browsers had communicated with the website publisher's server. (MTD at 11–12.) Xandr is wrong.

Plaintiffs allege in detail the specific technology and mechanism by which Xandr captures user data contemporaneously with users' communications to websites. (FAC ¶¶ 32–38.) Xandr makes use of software—JavaScript code—embedded directly into the website's source code that execute automatically during the page-load process, capturing and transmitting user data in parallel with the user's requests to the website necessary to render the page, not afterward. (FAC ¶¶ 34–36.) The user's browser simultaneously transmits these requests to the website and transmits duplicated data to Xandr's servers as part of the same rendering sequence. (*Id.*) This contemporaneous interception occurs before the page finishes loading and before the user's communication with the website is complete, not at some later date after the data has been stored. (*Id.*)

Courts routinely find that, at the pleading stage, allegations like those in the FAC satisfy the "in-transit" element of these statutes. *See Krzyzek*, 2026 WL 206855, at *7 (finding in-transit element satisfied when "complaint allege[d] that [defendant's] 'interceptions' occurred while users communicated with websites through their browsing activities"); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894 (S.D. Cal. 2025) (alleging that "tracking software employed by [defendant] intercepted her electronic communications 'contemporaneously' and 'simultaneously' and redirected them to third-parties, including Meta" sufficiently pleaded in-transit element); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 862 (C.D. Cal. 2024) (allegations that "after they entered their Search Terms, the Search Terms were replicated and sent in parallel to the tracking entities" sufficiently pled in-transit element); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 841 (N.D. Cal. 2014) (alleging that defendant's "interception occurred in transit, in transmission, and/or during transfer of users' private messages" sufficient to withstand motion to dismiss) (internal quotations omitted); *Riganian*, 791 F. Supp. 3d at 1092 ("Plaintiffs' FAC contains specific factual allegations that, if taken as true, plausibly allege real-time interception and contemporaneous reading[.]"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 838

(E.D. Cal. 2025) (recognizing that "allegations of simultaneous duplication and interception of communications sufficient to plead 'interception' while 'in transit' under CIPA at the motion to dismiss stage") (collecting cases).

Xandr's cited cases are not persuasive. For example, in *Valenzuela v. Keurig Green Mountain, Inc.*, the plaintiff "provide[d] no detail as to how the interception occur[red]," with plaintiff claiming an expert could resolve that question. 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023); *see also Griffith v. TikTok, Inc.*, 23-cv-00964, 2024 WL 5279224, at *10 (C.D. Cal. Dec. 24, 2024) (finding at summary judgment plaintiff failed to introduce record evidence as to how the tracker transmitted data); *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1117 (N.D. Cal. 2025) (finding at summary judgment that "filtering operation indisputably takes place after the communication"). Xandr cites *Zynga*, but that case did not address the in-transit element at all. 750 F.3d at 1102. And *Torres v. Prudential Fin., Inc.* addressed a different aspect of the analysis at summary judgment, whether defendant attempted to read or understand the contents of the communications while they were in transit. 22-cv-07465, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025). The court found the technology at issue there, "session replay" software, did not do so. *Id.* Xandr does not meaningfully develop that argument here.

As at the motion to dismiss stage in *Doe v. Eating Recovery Ctr. LLC*, Plaintiffs' allegations survive dismissal. 23-cv-05561, 2024 WL 2852210, at *1 (N.D. Cal. June 4, 2024) (rejecting defendant's dismissal bid based on allegations that the transmission of information through the at-issue tracking pixel was instantaneous). Requiring plaintiffs to allege the precise mechanism of how a defendant's technology works would require them "to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the" defendant. *Tenet Healthcare*, 789 F. Supp. 3d at 839. The in-transit element is sufficiently pled. *Krzyzek*, 2026 WL 206855, at *7 ("While [defendant] may be able to show that it does not actually intercept any communications in transit, that factual dispute is not appropriately resolved here."); *Hazel v. Prudential Fin., Inc.*, 22-cv-07465, 2023 WL 3933073, at *4 (N.D. Cal. June 9, 2023) (same).

**B. Plaintiffs' Invocation of the Crime-Tort Exception Defeats the ECPA's One-Party Consent Defense.**

Xandr argues that it is exempted from liability under the ECPA because the website operators consented to the interception by installing Xandr's code on their websites. (MTD at 13.) Xandr further contends that Plaintiffs have failed to adequately allege that Xandr's interceptions were done to commit a criminal or tortious act, which would invalidate the consent defense. (*Id.*) Consent is an affirmative defense that Xandr bears the burden to prove. *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021). Xandr does not carry that burden here. First, Plaintiffs do not allege the website publishers consented to the full scope of Xandr's interceptions. Second, Plaintiffs allege Xandr's interceptions were done to commit tortious acts: data aggregation and sharing in violation of the BSD Rule and California privacy torts.

**1. Plaintiffs do not allege the website operators consented to the full scope of Xandr's interceptions.**

While Plaintiffs acknowledge that the publishers of the websites they visited took steps to install Xandr's code and connect to its platform, the FAC does *not* allege that the website operators knew or understood the full scope of Xandr's interceptions, including what was being collected and how it was being used. This Court considered a similar scenario in *Meta Platforms*, 690 F. Supp. 3d at 1077. There, Meta argued "the third-party web developers . . . make their [tracking] Pixel-enhanced websites available to plaintiffs and their other healthcare customers, and by doing so those healthcare entities have necessarily consented to the transmission of data to [defendant] Meta." *Id.* The Court found the case unsuitable for resolution at the motion to dismiss stage. *Id.* at 1077–78 (rejecting that *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-cv-04792, 668 F. Supp. 3d 928, 935 (N.D. Cal. Apr. 6, 2023) required dismissal). Instead, it recognized that "[d]etermination of whether actual consent was given depends on what Meta disclosed to healthcare providers, how it described and trained healthcare providers on the Pixel, and how the healthcare providers understood the Pixel worked and the information that then could or would be collected by Meta." *Id.* at 1078. This reasoning is equally applicable here.

**2. The crime-tort exception invalidates any consent.**

Even if Xandr established the website operators consented to the complete scope of Xandr's interception, a consent defense is not absolute. The crime-tort exception vitiates any consent defense if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State." 18 U.S.C. § 2511(d). The focus of this inquiry "is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *Tenet Healthcare*, 789 F. Supp. 3d at 849; *R.C.*, 733 F. Supp. 3d at 901 ("[A] plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent of* the intentional act of recording or interception itself.") (emphasis in original). Determining "the purpose or purposes of the recordings are generally questions for the jury." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 687 (N.D. Cal. 2019).

The operative complaint contains factual allegations that would permit the application of this exception (assuming that Xandr can, in fact, later establish that it actually got consent to intercept communications) on a number of grounds. First, invasion of privacy and intrusion upon seclusion allegations like the ones Plaintiffs advance here satisfy the crime-tort exception. *Semien v. PubMatic Inc.*, 25-cv-03164, 2026 WL 216333, at *10 (N.D. Cal. Jan. 27, 2026) ("Where, as here, plaintiffs adequately alleged invasion of privacy, the Court is not convinced that ECPA's crime-tort exception does not apply."). This flows from holdings recognizing "that 'the association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies this exception.'" *Id.* (quoting *Brown*, 525 F. Supp. 3d at 1067); *see also Gilligan*, 2026 WL 32259, at *3 ("[T]he disclosure and use of Plaintiffs' information for advertising can plausibly constitute an independent invasion of privacy beyond the act of intercepting the information alone, satisfying the crime-tort exception."); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016) (recognizing further invasion of privacy harms from subsequent additional disclosure).

The FAC also alleges that Xandr violates federal regulations prohibiting the bulk transfer of data about Americans to certain countries ("countries of concern"), or to "covered persons," which are defined, among other things, as entities at least 50% owned by countries of concern, or by individuals who live in, work for, are controlled by, or are likely to act on behalf of, designated countries of concern. *See generally* 28 C.F.R. § 202 (the "BSD Rule"). As alleged in the FAC, the issue involves Xandr's dealings with Temu, a Chinese company under the influence and control of the Chinese government. (FAC ¶¶ 88–94.) China is one such "countr[y] of concern." 28 C.F.R. § 202.601(a)(1). The complaint explains that all the elements needed to show a violation of the BSD Rule are present: Porcuna plausibly alleges that Xandr shared the relevant protected identifiers of more than 100,000 consumers with Temu, triggering the BSD Rule's applicable threshold. (FAC ¶¶ 103–05, 198.) Porcuna points to the specific Temu endpoint contacted when she visited diabetesforum.com. (*Id.* ¶ 198.) And she alleges the scale and reach of Xandr's platform, which it claims leverages "billions of data points" and "20 billion daily cross-screen data signals refreshed every second" through code embedded in "tens of thousands of high-traffic website and mobile applications[.]" (*Id.* ¶¶ 23–25.) It is no stretch to allege that of these billions of touchpoints, 100,000 identifiers are passed to Temu, itself a massive entity that has drawn concern for its practice of "harvesting vast amounts of personal information from American consumers." (*Id.* ¶ 90.)

Xandr principally suggests that judicially noticeable documents show that Temu is not a "covered entity." (MTD at 15.) As an initial matter, the argument is entirely premature. As explained above, Plaintiffs need not plead around affirmative defenses, such as consent. As a corollary, Plaintiffs need not, therefore, establish *exceptions* to potential defenses at the motion to dismiss stage. That is two steps removed from Plaintiffs' burden here, especially since, as explained above, Xandr's motion does not even establish a consent defense in the first place.

In any event, Xandr points to regulatory filings included with its motion to dismiss that relate to Whaleco, an entity that is not mentioned in the FAC at all. (MTD at 17.) According to Xandr, Whaleco is Temu's "U.S. operation." (*Id.*) This is not an appropriate use of judicial notice. Xandr's filing ignores the factual allegations that PDD Holdings Inc. is the foreign entity

controlling Temu. (FAC ¶¶ 195, 197.) The FAC alleges facts supporting that Temu is at least 50% owned by individuals in China, a country specifically designated as a country of concern, and that data transfers to Temu qualify as data transfers to a country of concern. (*Id.* ¶¶ 104–05, 135, 201–02); *see* 28 C.F.R. § 202.601; 28 C.F.R. § 202.208 (including "any political subdivision, agency, or instrumentality" of China). Temu has been condemned as a national security threat, with nearly two dozen attorneys general warning about the company's data practices and ties to individuals in China and the Chinese government, with others instituting legal proceedings. (FAC ¶ 93); *see also* Diane Rinaldo, *Looking Beyond TikTok: The Risks of Temu*, Center for Strategic & International Studies (Oct. 24, 2024), https://perma.cc/DXB5-BDPX ("Temu has existing relationships with arms of the CCP involved in data oversight, control, and propaganda and is obligated to cooperate—under China's National Intelligence Law—with CCP authorities[.]"); *Attorney General Miyares Demands Answers About Online Retailer Temu's Business Practices and Chinese Communist Party Connections*, Office of the Attorney General of VA (last visited Apr. 10, 2026), https://perma.cc/VYE3-7M2V (investigating Temu's ties with the Chinese government and data collection and sharing practices); Hilal Aka, *The FTC's Amazon-Temu Blunder: Working With China to Target American Tech*, Aegis Insights (Jan. 31, 2025), https://perma.cc/2N97-NNN6 (addressing investigation into Temu's data practices). Porcuna thus alleges that Temu is "operated and controlled by PDD Holdings Inc., a Chinese company with substantial operations and executive oversight in the People's Republic of China[.]" (FAC ¶ 197.) The regulatory filings do not establish that it is beyond dispute that Temu is *not* controlled by China, Chinese citizens, or persons under the influence or likely to act on behalf of China. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000–01 (9th Cir. 2018) (holding it improper to take judicial notice of reasonably disputed facts at the motion to dismiss stage).

Indeed, Xandr's argument, and the documents it submits, invites the question whether *Whaleco* is a covered entity: PDD Holdings straightforwardly acknowledges that the entire purpose of its corporate structure is to "allow[] foreign investors to have exposure to Chinese-based operating companies that are subject to restrictions on direct foreign investment under

Chinese law." (Nguyen Decl. Ex. E, at 5 [Dkt. 28-2, at 148].) The idea that this regulatory filing somehow exonerates Xandr does not withstand scrutiny.

Xandr also misrepresents the BSD Rule's effective date. Despite acknowledging the BSD Rule went into effect in April 2025, Xandr claims that the U.S. Attorney General announced a "grace period" through July 2025. (MTD at 15–16.) This overstates what the Attorney General actually announced: the relevant division would "not prioritize civil enforcement actions" during that time "so long as the person is engaging in good faith efforts to comply." *Data Security Program: Implementation and Enforcement Policy Through July 8, 2025*, U.S. Department of Justice (Apr. 11, 2025), https://www.justice.gov/opa/media/1396346/dl?inline. It says nothing about deferring the BSD Rule's effective date or requirement to comply with the Rule. To the contrary, the same memo points out that the office "will pursue penalties … for egregious, willful violation" during that period, and that the memo "does not create any privileges, benefits, or rights . . . in any administrative, civil, criminal, or other matter." *Id.* at 2–3. Nor is it significant that the Attorney General has not separately designated Temu as a "covered person." (MTD at 16.) There would be no need, as Temu is properly categorized as a "covered person" based on other subsections of the BSD Rule. *See* 28 C.F.R. § 202.211(a), (b)(8).

Furthermore, putting Xandr's bulk transfer of sensitive data to one side, Xandr contends that any interception of Plaintiffs' data occurred in furtherance of its routine business operations, and that this commercial purpose bars the crime-tort exception. (MTD at 15.) This overlooks that a commercial purpose and a tortious purpose are not mutually exclusive. "As numerous lower courts have found, being primarily motivated by profit does not render the crime-tort exception inapplicable." *Semien*, 2026 WL 216333, at *10 (collecting cases); *Gilligan*, 2026 WL 32259, at *3 (same); *Krzyzek*, 2026 WL 206855, at *8 (same); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 686 (N.D. Cal. 2019) (recognizing, in determining scope of crime-tort exception, "an illegal purpose does not have to be the sole purpose of the recording"). As one court recognized, endorsing Xandr's reading would immunize a would-be defendant from blackmail so long as their ultimate reason was to make money. *R.S. v. Prime Healthcare Services, Inc.*, 24-cv-00330, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025). That

one motivating factor was for commercial gain does not shield Xandr. Rather, if the interception was done to facilitate some further impropriety independent and separate from the interception, the crime-tort exception applies. *Id.* Here, Plaintiffs allege the interceptions were done to further two types of tortious activity: the building of cradle-to-grave profiles of consumers in violation of California law, and the aggregation and sharing of consumer data with a Chinese controlled entity in violation of the BSD Rule. To the extent it is necessary to do so, then, Plaintiffs successfully allege Xandr's conduct fits within the crime-tort exception and defeats any consent argument.

### C. Plaintiffs Sufficiently Allege an Invasion of Privacy Under the California Constitution and Intrusion Upon Seclusion.

Xandr last attacks Plaintiffs' common-law and constitutional privacy claims. As Xandr recognizes, "[b]ecause claims for intrusion upon seclusion and invasion of privacy under the California Constitution have 'similar elements,' courts 'consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive.'" *Riganian*, 791 F. Supp. 3d at 1085 (quoting *In re Facebook*, 956 F.3d at 601); *Katz-Lacabe*, 668 F. Supp. 3d at 941 (same). Xandr asserts Plaintiffs fail to allege either element. Xandr's argument, however, is based on a contorted reading of the FAC—one that attempts to impermissibly recast Plaintiffs' actual allegations about Xandr's widespread surveillance and data aggregation into generalized complaints about run-of-the-mill advertising behavior. As explained below, this gloss is unavailing. Plaintiffs adequately allege how Xandr's surreptitious collection of their browsing data, which Xandr develops into detailed profiles it leverages for its own profit without their consent, meets these elements. *See, e.g.*, *In re Facebook*, 956 F.3d at 599 (finding harm to protectable privacy interests where defendant created profiles that "would allegedly reveal an individual's likes, dislikes, interests, and habits over a significant amount of time, without affording users a meaningful opportunity to control or prevent the unauthorized exploration of their private lives.").

#### 1. Plaintiffs have a reasonable expectation of privacy in the comprehensive data Xandr collects and enriches to create detailed dossiers.

A reasonable expectation of privacy exists where a defendant gains "'unwanted access to

data by electronic or other covert means, in violation of the law or social norms.'" *In re Facebook*, 956 F.3d at 601–02 (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009)). Xandr contends that Plaintiffs lack a reasonable expectation of privacy because individuals do not expect that their routine, everyday browsing behavior will remain private, and individuals should assume, given the inherent nature of the Internet, that their data is going somewhere. (MTD at 18–19.)

But Plaintiffs' allegations encompass conduct that goes far beyond standard website analytics. Plaintiffs set out how Xandr—an unknown and undisclosed data broker, not the website publisher—covertly operates in the background to collect troves of browsing data from the websites Plaintiffs visit. (FAC ¶¶ 118, 165.) This data includes sensitive information, such as full-string URLs that revealed the health-related information they were browsing, as well as persistent device identifiers, hashed emails, and advertising identifiers. (*Id.* ¶¶ 36, 132, 142.) Xandr then uses this information to de-anonymize and follow individual consumers as they navigate the internet, even across devices and services, building up detailed dossiers of their behaviors, health status, sexual preferences, interests, habits, likes, dislikes, and political affiliations. (*Id.* ¶¶ 43–46, 57–62, 70–72.) Xandr does not stop there. In addition to all of the data that it collects firsthand, it obtains even more data about individuals from more than 190 "identity-resolution partners," through which Xandr cross-references the data it has to enrich it even further. (*Id.* ¶¶ 64–66.) Taken together, this provides Xandr comprehensive, individualized profiles of consumers that Xandr commercially exploits for its own gain.

Courts have long recognized that individuals have a reasonable expectation of privacy in aggregated information like this obtained through pervasive data collection practices. *See Gabrielli v. Motorola Mobility LLC*, No. 24-cv-09533, 2025 WL 1939957, at *1, *9–10 (N.D. Cal. July 14, 2025) (alleging tracking "cookies collect detailed information about users' activity on the website, including their browsing history, user inputs, demographic information, shopping behavior, referring URLs, session information, IP addresses, geolocation data, and device information. . . . [which was] transmitted in real time and used to build behavioral profiles and serve targeted advertising" stated invasion of privacy under the California Constitution and intrusion upon seclusion); *Selby v. Sovrn Holdings, Inc.*, No. 25-cv-03139, 2025 WL 2950164, at

*3 (N.D. Cal. Oct. 17, 2025) (same). This follows from *In re Facebook*, where the plaintiff alleged that "Facebook acquire[d] an 'enormous amount of individualized data' through its use of cookies on the countless websites that incorporate Facebook plug-ins" that "can be easily collected without user knowledge." 956 F.3d at 603. The plaintiff argued this aggregation "divulge[d] a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's platform," affording Facebook "cradle-to-grave profile[s]" on internet users without their permission. *Id.* at 599, 605. The court recognized Facebook's collection of an individual's "comprehensive browsing history" allowed it to "compile a 'vast repository of personal data'" and "highly personalized profiles from sensitive browsing histories and habits." *Id.* at 603–04. It thus held the plaintiff "adequately alleged a reasonable expectation of privacy" in such information. *Id.* at 603.

Xandr suggests that *In re Facebook* turned on "defendant's alleged misrepresentations or deceptive conduct," which created a reasonable expectation of privacy where none might otherwise exist. (MTD at 20–21 (citing *In re Facebook*, 956 F.3d at 602).) But the court in *Riganian* correctly recognized that *In re Facebook* "did not hold that such misrepresentations are required to establish a reasonable expectation of privacy." 791 F. Supp. 3d at 1086. Rather, the inquiry focuses on the overall "sensitivity of the data collected and the manner in which it was collected." *Id.* And courts have routinely found a protectable privacy interest in circumstances like those presented here. *See Krzyzek*, 2026 WL 206855, at *4 (finding a reasonable expectation of privacy when defendant "allegedly tracks, compiles, and sells massive amounts of information on plaintiffs, without their knowledge that [defendant's tracking] pixel has been loaded onto a given website"); *Semien*, 2026 WL 216333, at *6 (same); *Riganian*, 791 F. Supp. 3d at 1088 (finding reasonable expectation of privacy against defendant using "tracking and identity resolution to create persistent identifiers linked to comprehensive behavioral profiles, and a data marketplace enabling the sale of sensitive personal information.") (quotation marks omitted); *Katz-Lacabe*, 668 F. Supp. 3d at 942 (finding reasonable expectation of privacy allegedly violated when defendant accumulated "a vast repository of personal data" from defendant's tracking software, which was used to advertise); *see also Gilligan*, 2026 WL 32259, at *2 (finding reasonable expectation of

privacy against "unauthorized widespread tracking and data collection, allowing [defendant] to compile detailed profiles of each [p]laintiff's online web browsing activity tied to their email address and other personal identifiers, and that [defendant] continues to track 'future web browsing activity across the internet.'"). Just as in these cases, Plaintiffs have a reasonable expectation of privacy in the wide-ranging data that Xandr captured, enriched, and monetized even after their initial website visits. *In re Facebook*, 956 F.3d at 604 n.7 (acknowledging "individuals maintain the expectation that entities will not be able to collect such broad swaths of personal information absent consent."); *Pemberton v. Rest. Brands Int'l, Inc.*, 25-cv-03647, 2025 WL 3268404, at *5 (N.D. Cal. Nov. 24, 2025) ("By contending third parties use the allegedly collected information to develop 'profiles containing detailed information about a consumer's behavior, preferences, and demographics' and 'learn intimate details of their lives,' [p]laintiff plausibly alleges the information might be sensitive to a reasonable person, which is sufficient to survive a motion to dismiss.").

For these reasons, Xandr's contention that browsing public webpages is no different from "browsing shelves at a bookstore or flipping through magazines in line at a grocery store" also fails to persuade. (MTD at 18.) First, unlike shoppers in physical stores, internet users' activities are not necessarily in full view for anyone also on that website to see exactly what they are doing at every moment they are on the website. But, more importantly, a shopper would have no reason to suspect that the store was communicating in real time what they were looking at to a third party who was using that information for its own commercial gain. So too here, Xandr's presence is completely unknown to users of the website, as is the scope and purpose of its data collection and use. Finally, once the shopper leaves the public store, the retailer or other shoppers' observation ends there. The shopper is not expecting anyone to follow them to their next destination or tracking them when they switch from an Uber to a bus to get there. Xandr, on the other hand, does track users across the internet, including when they switch devices and access other websites and services. And throughout this tracking, Xandr is collecting data points and expanding and enriching the profiles that it has on the individual user sufficient to categorize them across more than 650,000 individual segments for advertisers to target. It is no wonder courts have found that

such "alleged conduct is very different from being observed by a retailer while shopping in a store." *Krzyzek*, 2026 WL 206855, at *4; *see also Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1259 (N.D. Cal. 2024) (finding this argument "not persuasive for obvious reasons").

Xandr argues the "amount [and] type of data" it captured is also insufficient to give rise to any expectation of privacy. (MTD at 19.) As an initial matter, the Ninth Circuit in *In re Facebook* already rejected the "argument that in order to show a reasonable expectation of privacy, a plaintiff must 'identify specific, sensitive information that [defendant] collected' and that a 'more general allegation that [defendant] acquired an enormous amount of individualized data is insufficient.'" *Riganian*, 791 F. Supp. 3d at 1087 (quoting *In re Facebook*, 956 F.3d at 603). Here again, Xandr attempts to brush past the allegations that Xandr "surreptitiously collects, enriches, de-anonymizes, and sells [Plaintiffs' information] without the[ir] knowledge or consent" (FAC ¶ 155) to instead focus on certain discrete pieces of data that Xandr collects, like "cookie identifiers, device identifiers, IP addresses, and browser and device metadata, along with the URL of the webpages they viewed." (MTD at 19). Collecting one or another of these pieces of data in a vacuum may not in all instances be actionable. *See, e.g.*, *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025). But Xandr ignores that collecting all of these identifiers without an individual's knowledge or consent, then de-anonymizing and enriching it to create an advertising profile that follows one across devices and throughout the internet *is* actionable.[4] *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 932 (N.D. Cal. 2024) (recognizing collection of IP addresses actionable when it allowed defendant to collect downstream identifying information that allowed targeted advertising); *Riganian*, 791 F. Supp. 3d at 1087 (finding reasonable expectation of privacy when "plaintiffs have alleged the comprehensive aggregation of data that reveals a

---

[4] This case is thus worlds apart from *Thomas v. Papa Johns Int'l, Inc.*, 22-cv-2012, 2024 WL 2060140, at *3 (S.D. Cal. May 8, 2024) and *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 951 (S.D. Cal. 2024), when plaintiffs knew they were providing specific information to the defendants, including payment information to order food or information in a chat related to product support. *Cf. Gilligan*, 2026 WL 32259, at *2 (distinguishing cases where non-sensitive interactions with one website were only thing at issue, finding "materially more invasive" allegations that defendant "compiled detailed profiles by tracking their interactions across many websites, and that the tracking 'across the internet' remains ongoing").

person's internet activity with specificity such that the [defendant's] profiles allow others to determine an individual's personal interests, searches, and habits on third-party websites"). That is particularly true when among the information being collected are full-string URLs from healthcare websites like those Plaintiffs visited. *See FullStory, Inc.*, 712 F. Supp. 3d at 1259 (rejecting defendant's reliance on *Hammerling v. Google LLC*, No. 21-cv-09004, 2022 WL 17365255, at *8–9 (N.D. Cal. Dec. 1, 2022), and argument that disclosure of URLs was non-actionable routine browsing information, emphasizing the at-issue site specialized in provision of healthcare information, prescriptions, and other sensitive services).

While Xandr again points to its privacy policies and the policies on the websites to argue these entities were up front about what they were doing, these "disclosures have no effect on [Plaintiffs'] reasonable expectations of privacy" when they did not know they existed. *Riganian*, 791 F. Supp. 3d at 1086. Xandr's attachment of the websites' privacy policies does not establish as a matter of law that they apply to Plaintiffs' interactions with websites or that they cover the at-issue data. *FullStory, Inc*., 712 F. Supp. 3d at 1254 (declining to grant motion to dismiss based on attached website privacy policy, finding that "how reasonable persons would interpret the totality of the disclosures has not been decided"); *see also Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 601 (N.D. Cal. 2021) ("[T]he mere existence of a privacy policy is not dispositive because users might lack actual or constructive notice of the policy.").

**2. Xandr's massive surveillance operation is highly offensive to a reasonable person.**

Plaintiffs also sufficiently allege that Xandr's intrusions are unacceptable and violate social norms. *See In re Facebook*, 956 F.3d at 606. "Determining whether a defendant's actions were 'highly offensive to a reasonable person' requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Id.* (quoting *Hernandez*, 47 Cal. 4th at 287). Notably, this inquiry is ill-suited for resolution at the motion to dismiss stage. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) ("Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is.");

*Gilligan*, 2026 WL 32259, at *2; *Katz-Lacabe*, 668 F. Supp. 3d at 942–43. "Only if the allegations 'show no reasonable expectation of privacy or an insubstantial impact on privacy interests' can the 'question of [a serious or highly offensive] invasion [ ] be adjudicated as a matter of law.'" *Gabrielli v. Haleon US Inc*., 25-cv-02555, 2025 WL 2494368, at *8 (N.D. Cal. Aug. 29, 2025) (quoting *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 40 (1994)). Here, Xandr has not made that showing in the face of Plaintiffs' allegations.

Plaintiffs sufficiently allege how Xandr's code covertly collected their interactions with health-specific websites reflecting chronic illnesses, (FAC ¶¶ 129–30, 139–40); used that data in connection with identity-resolution partners that stripped away any pseudonymity, (*id.* ¶¶ 40, 50–51, 54, 57–60); allowed segmentation into specific audience groups based on health conditions, (*id.* ¶¶ 24, 71–72); and broadcast that information and associated data in real time to hundreds of entities including foreign entities under regular investigation for exploiting their access to data about Americans, (*id.* ¶¶ 6, 8–11, 22, 28, 115–16, 127, 134–35, 143–44). Courts have repeatedly found that allegations like these "satisfy the requirement for a 'highly offensive' intrusion that invades reasonable internet users' expectations of privacy." *Gilligan*, 2026 WL 32259, at *2; *Semien*, 2026 WL 216333, at *7 (finding that "at this stage, the Court cannot conclude that [defendant's] conduct was not offensive"); *Riganian*, 791 F. Supp. 3d at 1088 ("[T]he Court cannot at this stage conclude as a matter of law that the alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge is not highly offensive."); *see also FullStory*, 712 F. Supp. 3d at 1259 ("it would be premature to hold that [defendant's] alleged tracking of the various pages that plaintiff may have visited within [website's] platform when seeking healthcare services cannot constitute an invasion of privacy.").

Xandr argues that "routine commercial behavior" can never be highly offensive. (MTD at 22.) That is not clear. Regardless, Plaintiffs' "allegations of data collection [] go well beyond the 'routine commercial behavior' of collecting contact information for sending advertisements." *Katz-Lacabe*, 668 F. Supp. 3d at 942; *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1061 (N.D. Cal. 2014) (rejecting "routine commercial behavior" defense because the "'highly offensive'. . . . question is best left for a jury."). Here, Plaintiffs allege what data Xandr collected without their

knowledge or consent—including information about their visits to healthcare websites—and what it did with it—enriching and de-anonymizing it to use it to sell targeted advertising based on Plaintiffs' data. Whether this sort of conduct is "highly offensive" cannot be decided as a matter of law at this stage.

**D. Xandr's Catch-All Arguments Do Not Support Dismissal.**

Xandr's final argument is a general assertion that Plaintiffs' allegations do not meet Fed. R. Civ. P. 8(a)'s pleading standards. (MTD at 23.) In so doing, Xandr largely offers a rehash of the arguments it already raised elsewhere in the brief. The little new material it includes does not bolster its argument.

Plaintiff Porcuna alleges how she visited diabetesforum.com following a medical diagnosis in 2013 and was actively viewing "health-related pages" there in June 2025, with Xandr capturing the "full URL of the specific health-related page" she was viewing along with behavioral segment data that "further indicated and revealed Plaintiff Porcuna's health interests and vulnerabilities, even beyond what is revealed by the URL itself." (FAC ¶¶ 129, 132–33.) Likewise, Plaintiff Alexander alleges that she visited healthline.com on three occasions and the full-string "URLs and contextual signals transmitted to Xandr revealed sensitive health-related topics reflected in the content [she] was reading," which was further supplemented by behavioral segment data describing her "inferred interests, health concerns, and vulnerabilities." (FAC ¶¶ 139, 142–43.)

In *Doe v. Regents of University of California*, this Court rejected the argument that Xandr advances, that plaintiff should have alleged "[f]acts showing what *specific* medical information was entered by [p]laintiff . . . [and] which of that alleged medical information actually was transmitted to [defendant] and in what form." 672 F. Supp. 3d 813, 819 (N.D. Cal. 2023) (emphasis in original). Instead, the Court recognized that "[a]t the motion to dismiss stage, it is not necessary for plaintiff to provide more specific medical details." *Id.* (finding allegations that plaintiff "entered medical information, including information relating to her heart issues and high blood pressure, into the patient portal."); *see also Semien*, 2026 WL 216333, at *4 (finding allegations sufficient when plaintiff alleged defendant ad platform "compiled detailed user profiles by tracking plaintiffs' interactions across many websites, including sensitive browsing activity,

without plaintiffs' knowledge or consent" and that defendant "intercepts communications that can include sensitive information like health status and treatment, travel plans, political affiliation, sexual orientation, and more."); *FullStory*, 712 F. Supp. 3d at 1258 (recognizing that disclosure of URLs can be actionable when they "concern sites that specialize in provision of healthcare information, prescriptions, or other sensitive services.").

Xandr's reliance on *Doe I v. Google LLC*, 741 F. Supp. 3d 828 (N.D. Cal. 2024) is misplaced. There, the plaintiffs failed to allege "details about their investigation, nor do they explain how they have determined that their private health information has been intercepted by Google." *Id.* at 838. The plaintiffs even failed to identify what specific information was captured, asserting that the intercepted information "'may include' specific information like patient device identifiers or search terms." *Id.* at 839. The FAC provides a walkthrough of exactly how Xandr's embedded code works, the categories of information that it obtains, including down to the specific Temu endpoint that Xandr synced with on diabetesforum.com. (*See* FAC ¶ 198.) *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117 (S.D. Cal. 2023) ("*Cousin I*") is distinguishable for similar reasons. The original complaint failed to allege any health information was shared on a patient scheduling page. *Id.* at 1128. And following amendment, the *Cousin* plaintiffs were allowed to proceed when they "allege[d] that their data included personal search queries—such as specialty healthcare providers and treatments for medical conditions." 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023); *In re Allstate & Arity Consumer Privacy Litig.*, 25 CV 407, 2026 WL 594708, at *5 (N.D. Ill. Mar. 3, 2026) (distinguishing *Cousin I*, noting there is "no similar deficiency" where "the plaintiffs allege that the SDK collects all manner of personal data regardless of how one uses the device"). Plaintiffs allege the full-string URLs that Xandr intercepted did exactly that, with Xandr learning, for example, about Porcuna's diabetes, her searches for support communities, and information about her health conditions. (FAC ¶¶ 129, 132–33.) Xandr's kitchen-sink arguments provide no grounds warranting dismissal.

## IV. CONCLUSION

For the foregoing reasons, Xandr's motion to dismiss should be denied in its entirety.

Respectfully submitted,

**MARISSA PORCUNA** and
**GENA ALEXANDER**, individually
and on behalf of all others similarly situated,

Dated: April 10, 2026

*/s/ Brandt Silverkorn*

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Attorney for Plaintiffs and the Putative Class*